## CHARLES C. CARLETON V. STATE OF NEBRASKA.

### FILED JANUARY 4, 1895.    No. 6772.

1. **Murder.** The evidence examined, and *held* sufficient to sustain
a conviction of murder in the first degree.

2. **Criminal Law:** WEIGHT OF EVIDENCE: CREDIBILITY OF WIT-
NESSES. In criminal cases, as in civil, the credibility of wit-
nesses and the weight to be given their testimony are matters
for the determination of the jury. It is for the jury to deter-
mine whether it is convinced beyond a reasonable doubt of the
defendant's guilt, not for the reviewing court to say whether it
is so convinced. A reviewing court can only inquire whether
the evidence was sufficient to warrant the jury in finding the
defendant guilty.

3. ———: CIRCUMSTANTIAL EVIDENCE. Where in a criminal case
the evidence is circumstantial, the circumstances established,
must, to warrant a conviction, be such as to exclude every rea-
sonable hypothesis except that of the defendant's guilt. But,
this rule merely requires the exclusion of such hypotheses as are
based on circumstances established by the evidence. It does not
require the jury to acquit because of evidence which, if believed,
would establish facts consistent with innocence, but which evi-
dence the jury is justified in disbelieving.

4. ———: EVIDENCE: RULINGS ON OBJECTIONS. If the evidence
offered be legally admissible for any purpose, an objection to such
evidence should be overruled. Evidence cannot be excluded
because it is not material to every issue in the case.

5. **Homicide:** SELF-DEFENSE: CHARACTER OF DECEASED: EVI-
DENCE. In a prosecution for homicide it is admissible for the
defendant, having first established that he was assailed by the
deceased and in apparent danger, to prove that the deceased was
a person of ferocity and violent disposition, and this for the pur-
pose of showing either that the defendant was acting in terror
and hence incapable of that specific malice necessary to consti-
tute murder in the first degree, or that he was in such apparent
extremity as to make out a case of self-defense, or that the de-
ceased's purpose in encountering the defendant was deadly.

6. ———: ———: ———: ———. Such proof must be made by
evidence of the general reputation of the deceased. It cannot
be made by proving either specific acts on his part or the opin-

ions of witnesses as to his disposition based on their own obser-
vations.

7. ——: EVIDENCE. Certain rulings of the trial court on the ma-
teriality of evidence and the right of cross-examination reviewed
and the rulings sustained.

8. ——: INSTRUCTIONS. It is the duty of the court to instruct the
jury on the law of the case, whether requested so to do or not,
and an instruction or instructions which by the omission of cer-
tain elements have the effect of withdrawing from the consider-
ation of the jury an essential issue or element of the case is
erroneous; but when the jury is instructed generally upon the
law, and when the instructions given do not have the effect
above stated, then error cannot be predicated upon the failure
of the court to charge upon some particular phase of the case
unless a proper instruction was requested by the party com-
plaining.

9. ——: ——. A statement made by the court in ruling upon
the evidence, that an instruction of a certain character would
be given in relation to such evidence, does not excuse a party
from properly requesting such instruction at the proper time.

10. ——: ——. The failure or refusal of the court to instruct
the jury must be excepted to in the trial court in order to be
availed of on error.

11. ——: ——: MALICE: SELF-DEFENSE. If a killing be in
self-defense, it is not malicious, and if malicious it cannot be
in self-defense; therefore, where a jury is instructed that a kill-
ing in self-defense is excusable, the instruction is not erroneous
because it does not say that such killing is excusable, although
malicious, the other instructions properly defining malice.

'12. ——: ——. An instruction stating that one cannot avail
himself of the law of self-defense where, after he has secured
himself from danger, he takes the life of his assailant in a spirit
of revenge or for some unlawful purpose, is not erroneous, the
rest of the charge plainly stating that the taking of life from
motives of self-preservation, based on reasonable grounds of be-
lief, is not in pursuance of an unlawful purpose.

13. ——: ——: SELF-DEFENSE. Where the circumstances war-
rant the submission to the jury of the theory of self-defense, it
is not error to charge that if the defendant provoked the diffi-
culty for the purpose of wreaking vengeance on the deceased he
cannot avail himself of the law of self-defense, there being no
direct evidence of such an attack, but circumstances being such
as to warrant the inference of one.

Carleton v. State.

14. ——: ——: REASONABLE DOUBT. Where a charge distinctly states that to warrant a conviction the state must make out the whole case beyond a reasonable doubt, it is not necessary to repeat in every instruction the degree of proof required.

15. ——: ——. Instructions in a case are to be construed together, and if when so construed they state the law applicable to the case without confusion or conflict, a single instruction is not erroneous because in itself incomplete.

16. **Murder**: PURPOSE: MALICE. Where a person has actually formed the purpose maliciously to kill another, and has deliberated and premeditated upon it before committing the offense, this constitutes murder in the first degree. The length of time that intervenes between the time such purpose is formed and its execution is not material.

17. ——: INSTRUCTIONS. It is not error to instruct the jury that it is sufficient to constitute murder in the first degree, " if there was such design and determination to kill distinctly formed in the mind at any moment before or at the time the blow was struck," where the remainder of the instruction properly defines purpose, deliberation, and premeditation, states that the proposed act must have been deliberated and premeditated upon before it was committed, and it is evident that the language quoted referred to the existence of the purpose and not the time of its formation.

18. **Instructions**. A repetition of a proposition of law in the instructions is not reversible error unless it appears that such repetition might operate to the prejudice of the accused.

19. ——: WEIGHT OF EVIDENCE. It is not error to charge the jury that in weighing the testimony of the defendant they should fully and fairly consider whether it is true and made in good faith, the terms " true " and " made in good faith " being in such case synonymous, and, therefore, not implying that the testimony should be rejected, although true, if not " made in good faith."

20. **Criminal Law**: REASONABLE DOUBT. The following instruction held not erroneous: " The jury are instructed that a reasonable doubt is a term often used, probably well understood, but not easily defined. It is not every possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition

that they cannot say and feel that they have an abiding convic-
tion to a moral certainty of the truth of the charge. If upon
the proof there is reasonable doubt remaining, the accused is en-
titled to the benefit of it by an acquittal, for it is not sufficient
to establish a probability, though a strong one, arising from the
doctrine of chances, that the facts charged are more likely to be
true than the contrary, but the evidence must establish the facts
to a reasonable and moral certainty,—a certainty that convinces
and directs the understanding and satisfies the reason and judg-
ment of those who are bound to act conscientiously upon it.
This is proof beyond a reasonable doubt, because if the law,
which mostly depends upon considerations of a moral nature,
should go farther than this and require absolute certainty, it
would defeat criminal prosecutions altogether. A reasonable
doubt does not consist of possible or conjectured doubts. If
after a careful, impartial, and candid consideration of all the
evidence in this case the jury have an abiding conviction of the
guilt of the defendant, and are fully satisfied of the truth of the
charge against him, then they are satisfied beyond a reasonable
doubt."

21. ———: INSTRUCTIONS. A judgment will not be reversed be-
cause an instruction was somewhat argumentative in its nature,
when the argument consisted simply of stating a reason for a
rule of law, there being no comment upon the facts and no ap-
peal in any manner to the jury.

22. New Trial: MISCONDUCT OF PARTIES. Where a new trial is
asked for on the ground of misconduct of parties, jurors, or
witnesses, and the evidence is conflicting as to the existence of
such misconduct, the finding of the trial court will not be dis-
turbed.

23. Misconduct of Juror. A verdict should not be set aside be-
cause a juror, before the jury was sworn, was found with liquor
in his possession, it not being established that he was intoxi-
cated, or that after his acceptance as a juror he partook thereof.

ERROR to the district court for Dodge county. Tried
below before MARSHALL, J.

The facts are stated by the commissioner.

*Frick & Dolezal,* for plaintiff in error:

The admission of evidence for only one purpose was erro-

neous, because not followed by a proper instruction limiting it to that purpose. (*Scott v. McKinnish*, 15 Ala., 662; *Letton v. Young*, 2 Met. [Ky.], 558.)

The presumption of innocence remains with the defendant in a case where self-defense is interposed, and the burden of proof never shifts from the state to the defendant. (*Gravely v. State*, 38 Neb., 871.)

Where any fact or group of facts or circumstances are such as to be capable of two inferences, one in favor of guilt and the other in favor of innocence, the latter inference must be drawn and held until it is overcome by other proof. (*Dreessen v. State*, 38 Neb., 375; *McNamee v. State*, 34 Neb., 288.)

A reviewing court in a capital case should take conflicting evidence and inference and sift the case without reference to the verdict. (*State v. Goodson*, 12 S. E. Rep. [N. Car.], 329; *Raggio v. People*, 26 N. E. Rep. [Ill.], 377; *Warren v. State*, 16 S. W. Rep. [Tex.], 747; *Edwards v. State*, 26 Pac. Rep. [Wash.], 258; *State v. Billings*, 46 N. W. Rep. [Ia.], 862; *State v. Blackville*, 11 S. E. Rep. [N. Car.], 284; *Westbrook v. People*, 18 N. E. Rep. [Ill.], 304.)

Instructions on all matters in issue were necessary whether requested or not. (*State v. Matthews*, 20 Mo., 55; *State v. Stonum*, 62 Mo., 596; *Sandwich Mfg. Co. v. Shiley*, 15 Neb., 111; 11 Am. & Eng. Ency. Law, 251; *Milton v. State*, 6 Neb., 137; *Grim v. Robinson*, 31 Neb., 540; *Gilbert v. Merriam*, 26 Neb., 194; *City of Plattsmouth v. Boeck*, 32 Neb., 301.)

Instructions sixteen, seventeen, eighteen, and nineteen, relating to self-defense, were erroneous. (*Ballard v. State*, 19 Neb., 609; *Varnell v. State*, 9 S. W. Rep. [Mo.], 65. *Alexander v. State*, 7 S. W. Rep. [Tex.], 867; *Tingle v. Commonwealth*, 11 S. W. Rep. [Ky.], 812; *Gonzales v. State*, 12 S. W. Rep. [Tex.], 733; *Smith v. Commonwealth*, 16 S. W. Rep. [Ky.], 137; *Franklin v. State*, 18 S. W.

Rep. [Tex.], 468; *Bonner v. State*, 15 S. W. Rep. [Tex.], 821; *Nalley v. State*, 17 S. W. Rep. [Tex.], 1084.)

An erroneous instruction is not cured by giving in the charge a good instruction on the same point. (*McPherson v. Wiswell*, 19 Neb., 117; *Fitzgerald v. Meyer*, 25 Neb., 77; *Wasson v. Palmer*, 13 Neb., 376; *Ballard v. State*, 19 Neb., 610; *Selden v. State*, 18 S. W. Rep. [Ark.], 459.)

The tenth instruction is erroneous because it misstates the law as to deliberation and premeditation and omits to submit the question of the excitement of defendant. It is erroneous because, by three times repeating the shortness of the time of deliberation and premeditation, the court made that principle too prominent. (*Zimmerman v. State*, 14 Neb., 568; *Sherrar v. State*, 17 S. W. Rep. [Tex.], 621; *Reyons v. State*, 22 S. W. Rep. [Tex.], 590; 2 Thompson, Trials, secs. 2330, 2331; *Tillery v. State*, 5 S. W. Rep. [Tex.], 842.)

A juror who has an opinion based on rumor and newspaper accounts and says he can try the case the same as if he had heard nothing about it, is incompetent to serve in a criminal case. (*Miller v. State*, 29 Neb., 437; *Owens v. State*, 32 Neb., 167.)

*George H. Hastings, Attorney General, C. Hollenbeck, County Attorney,* and *Geo. L. Loomis,* for the state:

The verdict will not be disturbed when supported by evidence. (*Palmer v. People*, 4 Neb., 68; *Schlencker v. State*, 9 Neb., 241.)

As to the misconduct of jurors and the right of defendant to have the verdict set aside on that ground the following cases are cited: *Rider v. State*, 9 S. W. Rep. [Tex.], 688; *Burgess v. Territory*, 19 Pac. Rep. [Mont.], 558; *Townsend v. Briggs*, 32 Pac. Rep. [Cal.], 307; *Texas C. R. Co. v. Stewart*, 20 S. W. Rep. [Tex.], 962; *State v. Rush*, 8 S. W. Rep. [Mo.], 221; *Barker v. Livingston*

*County Nat. Bank*, 30 Ill. App., 591; *Warren v. Spencer*, 9 N. E. Rep. [Mass.], 527.

Before error can be predicated upon a failure of the court to present a particular feature of the case to the jury, the party complaining should, by an appropriate instruction, request the court to charge upon that feature. (*German Nat. Bank of Hastings v. Leonard*, 40 Neb., 676.)

The instruction of the court defining a reasonable doubt is a clear exposition of the subject, in almost the language that has been repeatedly approved by this court. (*Polin v. State*, 14 Neb., 540; *Carr v. State*, 23 Neb., 749; *Long v. State*, 23 Neb., 33.)

IRVINE, C.

The plaintiff in error was charged with murder, in the district court of Dodge county, found guilty of murder in the first degree, and sentenced to be hanged. This judgment he seeks to reverse by this proceeding. One hundred and fifty errors are assigned, and a review of the case has been necessarily laborious, although we have been aided by able efforts of counsel on each side and by a transcript of the record which might well serve as a model. We shall first consider the assignment of error that the evidence was insufficient to sustain the verdict rendered. The serious nature of the case, as well as the fact that a statement of the evidence at this time will assist in understanding the discussion to follow of the specific assignments, warrants us in narrating the evidence in some detail, even though such a course necessarily must extend this opinion further than is usually expedient.

In 1892, August Gothman, the deceased, was a resident of Shelby county, Iowa. He seems to have been a German by birth, and was about forty-five years of age. In November of that year he was married in that county to one Minnie Orsulak, a girl eighteen years of age. At the time of the marriage Gothman was a widower with four children.

In the spring of 1893 he removed with his family to Pierce county, in this state. An old man named Dista, the father of Gothman's former wife, there lived with them, as did also the Orsulak family. In May of 1893 the Gothman family left Pierce county. Gothman left on horseback in the forenoon, while his wife, his four children, and Dista followed in two wagons in the afternoon of the same day. The defendant Carleton resided with his father about five miles west of Fremont on what is known as the "Military road." Carleton was twenty-four years of age.

Some time after the departure of the Gothman family from Pierce county, Dista, Minnie Gothman, and the four children appeared at Carleton's house. They arrived on Friday evening, May 19th. It does not appear how they came to stop there, and it does not appear that there had been any previous acquaintance or connection whatever between any of them and either of the Carletons. From what appears to be an assumption of counsel, rather than any direct inference from the evidence, it would seem that their object was to remain to await tidings of Gothman, who was supposed to have proceeded to South Omaha. While at the Carleton house Mrs. Gothman was habitually addressed by the children as "Minnie," and it is quite clear that for some time the Carleton household supposed she was an elder sister of the children. Between her and the defendant there arose a somewhat sudden attachment. On the Monday following their arrival Carleton and Minnie Gothman drove away from the Carleton house. Carleton testifies that he took her at her own request and started towards Fremont, and that on the way to Fremont she asked him if he did not know of some place in the country where she could get board; that he responded that he did know of such a place, and thereupon turned from the road leading to Fremont and drove her to the house of a man named Van Ness who lived some six or eight miles northwest of Carleton's. It is certain that he took her to Van Ness',

and that he there arranged for her remaining a week.  He then returned home, and in answer to questions by the other members of the Gothman family informed them that Minnie had gone to Sioux City and would not come back. During the drive to Van Ness', Carleton testifies that he proposed to marry Minnie, and that a marriage was agreed upon between them.  The following day the remainder of the Gothman family proceeded on their way to Omaha, and the day following that Gothman appeared with another man, saying he had a card from his family, and asking if there had been a family at Carleton's place.  Carleton described the family which had been there as an old gentleman and five children.  Gothman asked when they had left and where they said they were going.  Gothman stated that it was his family, but did not state his name.  Gothman then left.  The time of this incident is fixed as Wednesday, May 24.  The following Sunday Carleton proceeded to Van Ness', met Minnie there, went with her to North Bend, and proceeded by rail to Schuyler.  He says that on the way to Schuyler he first learned that her name was Orsulak and that she was not the sister of the Gothman children; that she informed him during the journey that Gothman and her people desired her to marry Gothman and that she did not want to do so.  They went to the county judge at Schuyler, procured a license, and a marriage ceremony was there performed.  Thereupon they returned to Carleton's home and lived together there as man and wife until the 8th day of June.  On the night of the 7th of June Gothman reappeared at the Ruwe hotel at Fremont, remained there over night and departed early in the morning of the 8th.  Carleton had an engagement on the 8th of June to shell corn in Fremont.  One John Hughes was also engaged in the same work, and about 7 o'clock of that morning Carleton and Hughes were driving along the "Military road," which follows the railroad from Carleton's place towards Fremont.  Carleton drove a team

Carleton v. State.

hitched to a wagon. Along the road Hughes observed a man walking along the railroad track. Carleton made some remark about the man which Hughes does not remember. Carleton testifies that he thought he recognized this man as Gothman. This man was walking west, which was towards the Carleton place. They drove on until they reached a cross-road leading north, when Carleton told Hughes to inform Wesson (for whom they were to shell corn) that he, Carleton, would not work that forenoon. Hughes dismounted and proceeded to Fremont, while Carleton turned north on the cross-road and, driving at a pace which he characterizes as a fast trot, proceeded by that cross-road and then by another road leading west, back to his home. Arriving there he found Minnie and his father. He told Minnie that he thought that Gothman was coming, and requested his father to take her to Van Ness'. He then unhitched the team from the wagon, and hitched it to a buggy. His father and Minnie mounted and drove towards Van Ness'. As they passed out upon the highway and turned to the west three men drove along the road going east and observed them. Two of these men were witnesses, and they testify that immediately after passing Carleton's place and about one hundred and fifty yards east of Carleton's they observed a man lying by the wayside, resting upon his elbow, his face turned in the direction of Carleton's house. They afterwards saw Gothman's body at Fremont and identified him as the man resting by the wayside. From their testimony it would seem at least probable that Gothman saw the senior Carleton and Minnie as they drove away.

A man named Lucke, an employe of Carleton, was that morning at work in a field about a mile and a half from the house. As Carleton, senior, and Minnie passed the field an interview was held between Carleton, senior, and Lucke. Lucke returned to the house and there found inside the house the defendant and Gothman, smoking to-

gether and engaged in what was apparently a friendly con-
versation.   Some inquiry was made by Carleton of Lucke
as to why he left the field.   Lucke explained that he had
broken an implement, and Lucke and the defendant left the
house, the defendant apparently to examine this implement.
When outside the house Lucke explained that he had re-
turned not because of such accident, but had come because
defendant's father had sent him down to avoid any trouble
between the defendant and Gothman, and had directed him
to work in the field across the road from the house.   Carle-
ton said to go back to the field; that he did not think
there would be any trouble; "that the old man was all
right."   Lucke then stated that he would like to attend a
meeting of the Sons of Veterans to be held at Fremont,
and would like to quit a little early.   Carleton then stated
that he need not work there ; that he could take the team,.
go to Fremont, shell corn there during the day and attend
the lodge, and Hughes would bring the team back.
Lucke then went to an upstairs room and changed his
clothes.   After doing so another conversation took place as
to which the evidence is conflicting.   Lucke's version of it
is that he told the defendant that he was afraid that Carle-
ton, senior, would be angry if he went away and if they
had any trouble the father would charge it to Lucke; and
that the defendant replied that "if the old man gave him
one word he would get away with him and the world would
never be any the wiser."   Carleton denies this, and says
that what he said was, that he didn't think there would be
any trouble but "if there is, I can take care of myself."
It appears from the evidence that Gothman came out of
the house some time while Lucke and Carleton were talk-
ing together, and when Lucke left was sitting outside the
kitchen door.   Just before Lucke drove away a man named
Malcolm drove into the yard.   Malcolm says that Carle-
ton and Lucke came out of the house together as he drove
up, and that another man, supposed to be Gothman, was sit-

ting on the well curb about ten or fifteen feet from the
house.   Malcolm remained some fifteen or twenty minutes
after Lucke left, Gothman remaining at the well curb the
whole time.   While Malcolm was there, Carleton went to
the barn and from there came towards the house with a
hammer in his hand.   Malcolm left at about 10 o'clock.
About 11 o'clock Carleton, with blood upon his shirt,
appeared at the house of a neighbor named Kimmel, and
stated to Mrs. Kimmel that he had killed a man.   The
details of this conversation and of others following can be
more properly stated later on.   He asked Mrs. Kimmel to
go to the field and inform her husband ; but then stating
that he intended to go also, she reached the conclusion that
it was unnecessary for her to go and he proceeded alone.
He talked to Kimmel, then proceeded to where another
neighbor, Mr. Middaugh, was at work, talked to Middaugh
and Middaugh's son, then returned to his house, put on his
coat, caught, saddled, and mounted a pony and rode to Fre-
mont, stopping on his way to inform at least one other
family of neighbors of the occurrence.   He went into Fre-
mont and delivered himself into custody.

Neighbors who had been informed of the occurrence
went to the Carleton house, and were soon followed by
persons from Fremont, including the coroner.   Carleton's
house has on its ground floor three rooms.   A kitchen lies
to the south, through which entrance to the house was cus-
tomary.   The door into this kitchen is on the east end of
the room.   Entering this door and turning to the right
one reaches a door into a room designated usually by
the witnesses as the "sitting room."   There is a step of
about eight inches as one goes through this door.   Open-
ing off of this sitting room to the west, and by a door
about midway across the room, is a bedroom, in which
there were two beds and a bureau.   Those who came to the
house observed outside the kitchen door some spots which
seemed to be blood.   Inside the kitchen there were more

traces of blood, and upon the carpet of the sitting room and between the doors referred to there were still more. The appearance of this room indicated that an attempt had been made to wash or wipe away the blood. Some charred substances were found in the kitchen stove. Within the bedroom, lying upon the floor and covered with a blanket was the dead body of Gothman, the head resting in a pool of blood. A hammer was found near the kitchen door, and the defendant's father the next day observed a splinter which had apparently recently been knocked from near the bottom of the door leading from the kitchen to the sitting room. A chair was at the same time found with one leg broken. There were no other evidences of a struggle observed.

After the coroner arrived the body of Gothman was placed in a box brought there for that purpose, loaded into an undertaker's wagon, driven to Fremont, and placed in a basement room occupied by the undertakers. The only wound noticed up to this time was a gunshot wound in the center of the forehead. In the evening an attempt was made to embalm the body, and something more than a pint and less than a quart of embalming fluid was injected into the brachial artery, when it was observed that the fluid was escaping through another wound in the back of the head. The following day an autopsy was held, when it was found that there were three wounds. One bullet entered the forehead about on the median line and about half an inch above the eyebrow. The left eyebrow was singed and the right eye ecchymosed. Another bullet entered the right temple on a line with the upper attachment of the ear and about an inch in front thereof. A third bullet entered some distance beneath the occipital protuberance. The autopsy did not develop with any degree of certainty the course taken by these three bullets. There was a great deal of medical testimony upon the subject of the wounds. It may be summed up as follows: The witnesses for the state consid-

ered any one of the three wounds sufficient to cause death in a very brief time. The witnesses for the defense did not consider either the wound in front or the wound in the temple necessarily fatal, and agreed that it was possible that a man might, after receiving either or both, struggle for some time vigorously. But they all thought that the wound in the back of the head was of such a character as to cause instant death. No witness testified that the other wounds would not probably cause instant death, but the effect of their testimony is that death or collapse would not necessarily follow from either or both of them. This testimony is important in considering the theory of the defense. As a result of the medical testimony it may be assumed that the jury was justified, in connection with the circumstances of the case, in finding either that death resulted instantaneously from the first shot, or that Gothman continued to struggle until the third shot was fired. There is no evidence to show in what order the three wounds were inflicted. We have mentioned them simply in the order in which they were discovered, and not with reference to any theory as to the order of their infliction.

It is evident that in the investigation of this case the relations of Gothman and the defendant with Minnie Orsulak, or Minnie Gothman, are an important element. There is no doubt she was the wife of Gothman. There is no doubt that within a very few days after Carleton first saw her she engaged herself to marry him. There is scarcely room for doubt that for some time after the family reached Carletons, he, as well as his father and his employe, Lucke, supposed her to be the sister of the Gothman children. The precise state of Carleton's mind, as well as Gothman's, becomes, therefore, important. So far as Gothman's information is concerned the evidence is very meager. He seems to have been informed that his family had stopped at Carleton's, and in his quest for them saw fit to go presumably from Omaha, or South Omaha, to en-

quire of Carleton as to their whereabouts. Upon his first
visit nothing occurred to inform him that Minnie had not
left with the rest of the family. He would naturally re--
turn to South Omaha expecting to find her with them.
There is evidence that he was in South Omaha on the 7th
of June, and was seen a short time before the departure of
an evening train going towards the depot. It also appears
that he saw Dista in South Omaha, but what occurred be-
tween them is not proved. It would be a fair inference,
if not one practically irresistible, that after Gothman re-
turned to South Omaha he learned that Minnie was not
with the family, and that his object in going to Fremont
the second time was, in part at least, to ascertain her where-
abouts. There is nothing in the evidence from which it
could be inferred that he had any knowledge of Carleton's
marriage to her. There is evidence tending to show that
the fact of the issuing of the license was published in the
Schuyler papers, but there is no evidence that Gothman
saw those papers, and to infer that he did would be a re-
mote conjecture. The most that could be inferred from
the evidence is that Gothman might have known from
communications with Dista and the children that there had
been some intimacy between Carleton and his wife, and
that he suspected Carleton of having something to do with
her elopement.

As to Carleton's information on the day of the shooting
the evidence is conflicting. His own testimony is that he
had no reason to suppose Minnie to be other than the sis-
ter of the Gothman children until, on the train to Schuy-
ler, she informed him otherwise, and that he did not know
until after the homicide that she was Gothman's wife.
Opposed to this is the testimony of Gothman's thirteen-
year-old daughter, to the effect that immediately after
Carleton took Minnie to Van Ness' the daughter informed
Carleton that Minnie was her step-mother. This child also
testified that while they were all at Carleton's Carleton

asked Minnie to let him see a ring which he seems to have
noticed, and that Minnie said that it was her wedding ring;
that Carleton then asked her where her husband was, and
Minnie said she would not tell him.    According to Carle-
ton's testimony Minnie had told him at some time before
the homicide that if Gothman found her he would want to
kill her for leaving him.    The credibility of witnesses is
for the jury, and from the above the jury would be justi-
fied in finding that before the homicide Carleton had
learned that Minnie was the wife of Gothman.    They
would almost surely find that his information was such as
to lead him to apprehend serious difficulty as a result of a
meeting with Gothman.

As the next step in reviewing the evidence it is proper
to consider the declarations made by Carleton after the
tragedy, as to the manner of its occurrence.    The first per-
son he saw was Mrs. Kimmel.    She testified that Carleton
came to her kitchen door; that she observed the blood upon
his clothing, and, supposing that he had been butchering
said, "You have been trying to kill yourself, have you?"
He said, "No, but I killed a man."    She then asked him
if the man was dead, and Carleton said that he had shot
him "until he couldn't go any more," and told her that he
was "a bum" who had asked him for something to eat,
and, being refused, had pulled his gun.    Whereupon Carle-
ton took the gun away from him and shot him.    Carleton
says that his remark was that he had shot him until the gun
would not go any more.

Carleton then proceeded to the field where Mr. Kimmel
was at work.    He told Mr. Kimmel that he had killed a
tramp; that the man wanted something to eat; that he
was standing in the door; that, as he went to go past him,
the tramp drew a gun on him; that Carleton seized the
gun, shoved it aside; that it went off, and he took it away
from the tramp and shot him.    Kimmel thinks Carleton
told him he shot him three times.    He exhibited the

Carleton v. State.

gun to Kimmel; took the cylinder out and exhibited that.
Kimmel did not observe the condition of the cylinder, but
remembers that Carleton said that there were three empty
cartridges.  From Kimmel's Carleton went to another field,
where J. C. Middaugh was at work.  To Middaugh he
said that a tramp had come to his place; that they had got
into a "fuss," and that he had killed the man; that the
man wanted bread; he would not give it to him; the man
drew a gun on him; Carleton took it away from him and
shot him with it.  He had a revolver apart, and holding
the cylinder up said, "Here, you can see how often I shot
him."  Middaugh observed three empty chambers.. Mid-
daugh further testifies that he advised Carleton to give
himself up, and that Carleton said that he had had a notion
to bury the man and say nothing about it; that he cleared
up the blood on the floor and burned up the man's hat,
and then thought it would not be best to bury him.
Carleton admits that he did burn up Gothman's hat, to-
gether with the cloth with which he had attempted to clean
the blood from the floor.  A son of Middaugh was at work
near his father.  After talking to Middaugh Carleton went
to the son and said that a man had come there, and he did
not intend "to let anybody run him out of his house;"
that they had talked about three-quarters of an hour, when
the man asked when the noon train passed; that Carleton
showed the man from the newspaper when the train left
Fremont; that the man then asked him for something to
eat, which Carleton refused, and the man drew a gun upon
him.  Carleton took his hand and shoved the gun aside,
the man fired, and Carleton then took the gun away and
killed him.  He also stated that the man claimed to come
from South Omaha and had been talking about renting a
farm.  Young Middaugh asked Carleton if he knew the
man's name and Carleton drew from his pocket-book a
piece of paper with the man's name on it.  Young Mid-
daugh had forgotten the name, but recalled it as Goffman.

Carleton v. State.

We do not think it necessary to detail the other state-
ments made by Carleton. Before going to Fremont he
made a substantially similar statement to another neighbor,
Mrs. Malloy, and in Fremont substantially similar state-
ments to the city marshal, the coroner, and to two news-
paper reporters who interviewed him. With the exceptions
already noted, Carleton admits that he made these state-
ments, and gave as an explanation that he did not wish to
disclose the truth until he should have an opportunity to
do so at the coroner's inquest. In the argument a very
strenuous and able effort is made to weaken the effect of
these statements, but counsel are driven, in order to do so,
to argue that almost every witness misunderstood or failed
in his memory as to Carleton's words in some respect. We
are aware that such misunderstandings and failures of
memory frequently occur, and that such evidence should
properly be considered by a jury with caution. But when
a number of witnesses substantially agree in their narra-
tion, and no interest is shown, the jury certainly has a
right to believe their testimony.

One other fact in this connection is significant. The
marshal, at Carleton's request, went with him to where
Lucke was working, and there Carleton said to Lucke,
"You know that tramp that was up to the place," or
something like that, and Lucke said "Yes," and Carleton
said, "I killed him." The marshal and Lucke corroborate
each other in regard to this statement. Carleton explains
that in the parlance of the neighborhood any one traveling
on foot was denominated a tramp, and that it was in this sense
that he used this term in speaking to Lucke and the other
witnesses. But bearing in mind the previous occurrences
in which Lucke had participated, and what had occurred
between Lucke and Carleton shortly before the tragedy,
the use of this language was certainly significant, and bears
strongly against the defendant. Viewed in the light most
favorable to Carleton this was not a frank statement to

Lucke, and taken in connection with Lucke's knowledge of the previous facts and Carleton's knowledge of that knowledge, it tends to show an intention on Carleton's part to give Lucke a hint in regard to the latter's action.

At this point it would be proper to review Carleton's testimony; but before doing so it may be well to say that the pistol with which the wounds were inflicted was a six-shooting Smith & Wesson revolver, which belonged to Lucke, and which Lucke kept sometimes in the drawer and sometimes on top of the bureau in the bedroom in which Gothman's body was found. This bureau stood in such a position that if the revolver lay on top of it, it might have been seen from some points in the sitting room. It appears that Carleton knew that Lucke had the re-volver. There is no direct evidence that he knew in what portion of the room Lucke habitually kept it, or where it was on that particular morning.

Carleton, as has been already intimated, took the stand on his own behalf. His testimony as to events prior and subsequent to the tragedy has been already sufficiently stated. His account of the shooting is briefly as follows: When Gothman first came he inquired of Carleton if the latter had seen a team of stray mules. Some further talk ensued when, at Carleton's invitation, Gothman sat down. Carleton gave him a cigar and they both smoked. After Lucke and Malcolm went away Carleton took the hammer mentioned by Malcolm in his testimony and set about driv-ing nails in the kitchen. Gothman inquired if there was any land to rent in the neighborhood. He wished Carle-ton to look around and inform him if he learned of any. Thereupon Gothman took a memorandum book from his pocket and at Gothman's dictation Carleton wrote Gothman's name and address in the book. Gothman then tore the leaf out and handed it to Carleton and asked Carleton to write his name and address. He then inquired as to the time when trains ran to Norfolk. He also inquired whether

Carleton was married, and then asked how long he had
been married. Carleton informed him, and told him his
wife "was over on the bluffs—went with my father."
Carleton by this time lit another cigar and presented
another to Gothman. He does not think Gothman lit it.
Carleton then went to a point near the house to get some
nails which he remembered having left there. When
Carleton left the house Gothman was sitting on the edge of
a table, the position of which Carleton fixes as in the sit-
ting room not far from the door leading to the bedroom,
but at a point from which the bureau in the bedroom was
not visible. Carleton returned toward the house, the ham-
mer in his right hand. Gothman met him at the kitchen
door, Gothman standing immediately inside the door. He
said to Carleton, "Where is my woman?" Carleton said
he did not know. Gothman said, "If you don't tell me I
will kill you," and thereupon put the gun close to Carle-
ton's face. Carleton is left-handed. He seized the gun
with his left hand, grasping the cylinder and barrel, and
endeavored to keep the muzzle away from himself and to
get the gun. Gothman was by these movements shoved
into the corner of the kitchen close to the door leading into
the sitting room. Carleton had placed his right arm around
Gothman and Gothman's left arm was under Carleton's.
While they struggled in this position the gun was dis-
charged. The struggle continued and the gun was again
discharged and then both men fell through the door-way
leading into the sitting room, Gothman upon his left side
and Carleton to Gothman's right. From the time they fell
upon the floor Carleton found his left arm free from Goth-
man and holding the gun. Carleton endeavored to fire it
off but does not know whether or not he succeeded. Carle-
on arose as quickly as he could. Gothman did not move.

It may be remarked that Carleton's narrative, however
improbable, is not necessarily inconsistent with any estab-
lished fact. Considering the physical facts alone the most

serious objection to accepting his account is the position of
the wounds in Gothman's head.   The defense accounts for
this upon the theory that in the struggle Gothman's head
was turned so as to present first his right temple and then
his forehead in front of the pistol, and that the wound in
the back of the head was received after Gothman fell to the
floor, through an accidental discharge of the pistol, prob-
ably on its striking the floor.   It is in evidence that after
the pistol had been placed in the custody of the officers in
Fremont it was accidentally discharged in removing it from
a drawer.   It also appears that on the trial there was a
broken spring in the pistol, while before the tragedy it was
in good order.

We think we have stated substantially all the important
evidence, and stated it as favorably to the accused as pos-
sible, and this evidence we think justified the jury in find-
ing the verdict of guilty.   Considering the relations of the
two men to Minnie Gothman, and the evidence which the
jury had a right to believe as to the knowledge of each in
regard to the other's relations to her; considering the de-
fendant's acts in abandoning his trip to Fremont and driv-
ing rapidly home by another road and forthwith sending
his father and Minnie away; considering the statement
Lucke swears was made to him; considering the probable
topic of discussion between the two men, the fact that
Gothman went to the house unarmed and could not have
known of the position of the pistol except by his own ob-
servation after he reached the house, and that Carleton
knew Lucke had the pistol and probably knew where it
was; considering the persistency after the shooting with
which Carleton related a false account of the events; and
considering especially the relative positions and character of
the three wounds, we think there can be no doubt that
there was sufficient evidence to warrant the jury in finding
that the shooting was willful and malicious, and that there
had been premeditation for some period.   The necessary

duration of the intent to kill will be discussed in considering the instructions.

It is argued that while there might be sufficient evidence to sustain a verdict in a civil case, that this one should not be sustained unless this court is satisfied by the evidence beyond a reasonable doubt of the defendant's guilt. But even in a criminal case the credibility of witnesses and the weight to be given to the testimony are questions for the jury. In weighing the evidence the jurors must be satisfied beyond a reasonable doubt that it establishes the guilt of the accused; but in examining the sufficiency of the evidence in this court our inquiry must be whether upon every essential element of the case there was evidence which the jury was justified in believing, and which, if believed, would establish the guilt of the accused. It is not for this court to determine the question of the accused's guilt or innocence by ascertaining whether as an original proposition we would be satisfied beyond a reasonable doubt. It is only for us to determine whether or not there was evidence upon which the jury was justified in basing its conclusion. (*Palmer v. People*, 4 Neb., 68; *Schlencker v. State*, 9 Neb., 241; *Murphy v. State*, 15 Neb., 383; *Housh v. State*, 43 Neb., 163.)

In those cases cited on behalf of the accused, where a verdict has been set aside by this court, it was not because the evidence before the jury, while entitled to some weight, did not have in the minds of this court the convincing effect deemed necessary in a criminal case, but it was because of a failure of proof on some essential features. Thus in *McNamee v. State*, 34 Neb., 288, there was not sufficient evidence to show that death resulted from the blow administered by the defendant. In *Dreessen v. State*, 38 Neb., 375, the proof was circumstantial, and the circumstances established did not exclude the hypothesis of death by natural causes. The plaintiff in error seeks to apply this principle. But it must be remembered that the

rule is, in regard to circumstantial evidence, that it must be of such a character as to exclude every reasonable hypothesis except˙ that of the defendant's guilt.   In *Binfield v. State*, 15 Neb., 484, this same rule was invoked, and the hypothesis of innocénce, which it was claimed had not been excluded, arose from a consideration of the testimony of the defendant; but it was said that the jury had a right to disbelieve his testimony, and if it was not believed it furnished no evidence of any hypothesis whatsoever.   So here the jury had a right, and it was its duty, to weigh Carleton's testimony as that of other witnesses, to consider his interest in the result, the inherent probability or improbability of his story and its harmony or want of harmony with known facts.   There was no evidence conclusively showing that his story was not true.   It might possibly be harmonized with established facts, but it was improbable and certainly did not compel belief.   The hypothesis of innocence which entitles a person accused of crime to an acquittal is an hypothesis based on the facts proved, not upon the possibility that an error was made in rejecting incredible testimony.

We are now brought to a consideration of the more specific assignments of error.   Owing to their number the discussion of each must be necessarily brief.   All the assignments have been considered, and we shall endeavor to present our conclusions upon each question of law involved, although it is not practicable to enter into elaborate discussions.   Ninety of these assignments of error relate to rulings of the court admitting and rejecting testimony.   We see no error in any of these rulings, but in the opinion shall refer only to those assignments to which attention is called in the briefs.   These are, however, fairly representative of nearly all the other assignments.

John Orsulak, the father of Minnie, being on the stand, was inquired of as to his acquaintance with Gothman.   It was shown by this witness that Gothman had been married

in November, 1892, and that the witness was present at
the marriage.   The question was then asked, "Whom did
he marry?"    An objection to this question was overruled,
and the witness answered that Gothman married witness'
daughter Minnie.   The court stated, with reference to this
objection, that the testimony could only be admitted for
one purpose, to-wit, to establish a motive, and that the jury
would be so instructed.   Counsel for the defendant there-
upon stated that with that understanding they would re-
frain from making further objections.   A question is pre-
sented which will be discussed later as to the failure of the
court to give such instruction.   So far as the evidence is
concerned we think it was clearly admissible for the pur-
pose stated by the court.   Evidence, if admissible for any
purpose, must be admitted.   It cannot be excluded simply
because it is not material to all of the issues.   The evi-
dence being proper for one purpose the court properly
overruled the objection, and, so far as the ruling on the evi-
dence goes, the objection neither gained nor lost force be-
cause the court stated a reason for the ruling.

In support, presumably, of the theory of self-defense
the defendant sought to introduce evidence as to the temper
and disposition of the deceased.   Several of the assign-
ments of error relate to rulings on questions of this char-
acter.   There was no effort made to show the reputation of
the deceased.   The court permitted several witnesses to tes-
tify as to their acquaintance with him, and to testify from
their observation as to his disposition in regard to violence
when in anger.   The court, however, excluded similar evi-
dence as to his exhibitions of jealousy.   There was a con-
stant effort on the part of these witnesses to relate some
particular instance of Gothman's attacking some one with
an ax.   These efforts the court always checked, as the court
also interfered wherever the questions asked were of such a
character as to elicit other proof of specific acts.   In this
course of ruling the court committed no error prejudicial to

Carleton v. State.

the defendant. As to the admissibility of evidence of the character of the deceased in such cases we think that the reasonable rule, as well as that which is gathered from a careful weighing of the conflicting cases on the subject, is well stated by a text-writer as follows: "It is admissible for the defendant, having first established that he was assailed by the deceased and in apparent danger, to prove that the deceased was a person of ferocity, brutality, vindictiveness, and of excessive strength; such evidence being offered for the purpose of showing either (1) that the defendant was acting in terror, and hence incapable of that specific malice necessary to constitute murder in the first degree; or (2) that he was in such apparent extremity as to make out a case of self-defense; or (3) that the deceased's purpose in encountering the defendant was deadly." (Wharton, Criminal Evidence, sec. 84.) But while this statement shows that the ultimate object of the proof offered was legitimate it does not obviate the general rule that when character is in issue the proof must be of general reputation, not of specific acts, and not by proving the opinion of the witness based on his own observation as to the general character of the person in question. This general rule is so well established that the citation of authorities would be superfluous. We wish, however, to call attention to the case of *Reg. v. Rowton*, 10 Cox C. C. [Eng.], 25, as being a comparatively recent case, presenting precisely the questions involved here, which are there elaborately and very ably discussed by several judges. In that case the evidence related to the character of the defendant, but this can make no difference in principle as to the nature of the evidence admissible. The error, therefore, was in admitting evidence amounting merely to the witnesses' conclusions, based upon observations of the deceased, and this was error in favor of the defendant. There was no error in refusing to permit this class of testimony to be made the cover for proof of specific acts.

Several questions were asked of the same witness by which it was sought to show that Gothman left Pierce county as a fugitive from justice, having committed a felonious assault just before leaving. This evidence was properly excluded. In so far as it might tend to establish character it was objectionable as relating to a single specific act. For no other purpose could it throw any light upon the case and it was wholly immaterial. One of the questions thus asked was as to whether Gothman had told the witness the morning he left Pierce county where he was going, and the offer was made to prove that he said he was going to look for stray cattle. This was wholly foreign to the issues and would establish nothing in anywise relating to this case.

When Lucke was upon the stand he testified that he had had a talk with Carleton, senior, as the latter drove by with Minnie, and that he had then gone to the house. It was not then shown what communication had passed between them, but Lucke swore that after reaching the house he told the defendant what his father had said, and then, over the objection of the defendant, he was permitted to relate what he told Carleton that Carleton's father had told Lucke. The statement was merely that Carleton, senior, had directed Lucke to come down to the house to avoid any trouble between the defendant and Gothman. This was a part of the *res gestæ*, and we think clearly admissible. It will be remembered that this conversation was held after Gothman reached Carleton's house, and that it related to the probability of trouble between Carleton and Gothman, and it was explanatory of Lucke's being there and of the conversation that led to the statement by Carleton about "getting away with the old man."

On cross-examination of Lucke it developed that in his testimony at the coroner's inquest he had not related Carleton's ominous remark about "getting away with the old man." On redirect examination he stated that he did not

relate this conversation because no question was asked him
to bring it out.   On recross-examination he was asked
whether the coroner did not ask him at the inquest, refer-
ring to Charley Carleton, "'What did he say he came back
for, Mr. Lucke?' and did you not answer to that, 'I be-
lieve he mistrusted this was the girl's father,' and follow-
ing that question did not the court ask you this, 'What
else did he say,' and did you not answer to that question,
'He hitched up the buggy, I suppose.'"   An objection to
this was sustained.   It will be observed that the questions
and answers included in this question as having occurred
at the inquest plainly related to a conversation upon Carle-
ton's return early in the morning instead of going to Fre-
mont, and his reasons for so doing, and did not relate in
any way, or suggest in any way, the conversation with
Carleton after Gothman arrived, or the conversation with
Carleton, senior.   It was not, therefore, relevant to the
subject of redirect examination.

When Carleton was upon the stand the first question in
cross-examination was as follows: "Charley, when did you
first tell this story of this transaction as you have told it on
the stand?"   This was objected to for several reasons, one
of which was that it might call for a statement made to de-
fendant's counsel.   The court instructed the witness that
he was not required to disclose any such statement or the
time of making it.   With that admonition the witness
was permitted to answer, and he stated in effect that he had
not told this story to others than his attorney.   Another
objection urged to this question, as well as to several of
somewhat similar import, is that it was unfair to the defend-
ant, first, because there was no evidence that he had ever
been examined in the same manner as when on the stand;
and, secondly, because the question characterized his account
of the affair as a "story."   It was already in evidence that
the defendant had a number of times immediately after the
shooting given a different account to different people, and

we think it was legitimate cross-examination to ascertain if possible when, if at all, he had first disclosed the state of affairs to which he had just testified. The state acted upon the theory, which the jury evidently believed, that this account was an afterthought, and, in sifting the story on cross-examination, the time when it was first told became a significant fact. The objection that the questions put to the defendant on the stand had never been asked him before has no force. If his account were true he would be able, without such an examination, to narrate its substance; and neither the defendant nor the jury could have been possibly misled by the question. Nor do we think that the fact that counsel for the state, in addressing the witness the question, characterized his narrative as a "story," affords any ground for complaint. The word "story" is in its etymology akin to "history." Of course, in examining such questions it will not do to consider merely questions of philology. It is necessary to consider the common and general acceptance of the words. The Century Dictionary defines the word "story" in part as follows: "A connected account or narration, oral or written, of events of the past; history; an account of an event or incident; a relation; a recital; a narrative, either true or fictitious, * * * specifically a fictitious tale; * * * the facts or events in a given case considered in their sequence, whether related or not; an anecdote; a report; an account; a statement; anything told; a falsehood; a lie; a fib;" etc. These definitions, while much more extended than those given in other dictionaries, are similar in their effect. Of course an intonation might be given implying on the part of counsel for the state a disbelief in defendant's narrative, but this in itself would be no ground for reversal. Counsel for the state were not required to believe or pretend to believe defendant's testimony, and the record does not preserve the intonation. Apart from the manner of counsel the question could only be objectionable if its effect were to place

in the mouth of the witness a word which by his being compelled to adopt it would imply falsehood on his part. Considering the definitions above given we do not think that any member of the jury could possibly have inferred from the fact that the witness answered the question, framed as it was, that he admitted that he had given a fictitious narrative.

A number of assignments of error relate to the instructions. One of the exceptions on this branch of the case goes to the failure of the court to give a specific instruction admonishing the jury to consider the evidence of the marriage of Gothman and Minnie only as bearing on the proof of motive. It will be remembered that when the state sought to introduce evidence of this marriage, objection was made, and the court stated that the evidence could be admitted only for the purpose of establishing a motive and that the jury would be so instructed. We have already held that the court did right in admitting the evidence. It is claimed now on behalf of defendant that the court erred in not, by an appropriate instruction, restricting the evidence to the purpose for which alone the court deemed it admissible. No exception was taken, at the time the jury was instructed, to the failure of the court to give such an instruction. No instruction was in the regular manner requested upon the subject, and we cannot find any assignment in the motion for a new trial presenting the question. The defendant claims, however, that in the absence of a request for an instruction it was the duty of the court of its own motion to instruct on every material feature of the case, and that the exceptions to the charge as given cover errors of omission as well as commission; that this is especially true in view of the statement made by the court when the evidence was received; and that the defendant had a right to rely on that statement and not make a specific request; that in any event the acceptance by the fendant of the ruling made during the trial and his re-

fraining from making further objections to that class of testimony amounted to a request. A number of cases are cited in support of the first proposition so advanced and a review of the authorities bearing on the question may not be inappropriate.

In *Meyer v. Midland P. R. Co.*, 2 Neb., 319, it was said that it is the right of a party by proper instructions to have the minds of the jury directed to the essential features of the case, and their attention challenged to the testimony which should influence them in making up their verdict, and that when this is not done, but their minds diverted from the real issues to be tried and permitted to wander into the region of conjecture, the chief value of a judicial trial is lost. But this language was used in discussing the refusal of the trial court to give a proper instruction when requested. In *Milton v. State*, 6 Neb., 136, it was said that the charge should be a clear and explicit statement of the law applicable to the facts in the case, and should cover all the questions involved in the issues, and that the instructions in the case then on hearing left the jury in doubt as to the law; but the case was not reversed for that reason, but, as the court carefully stated, for the sole reason that the verdict was not sustained by the evidence. It has been several times held that it being the duty of the court to instruct the jury on the law of the case, an entire failure so to do is reversible error, unless it is apparent that the jury, without the aid of instructions, came to the correct conclusion. (*Sandwich Mfg. Co. v. Shiley*, 15 Neb., 109; *York Park Building Association v. Barnes*, 39 Neb., 834.) And so it has also been held that the failure to submit to the jury a material issue in the case, where there is evidence to support it, is reversible error. (*Waldorf v. Haggin*, 39 Neb., 735; *Aultman v. Martin*, 37 Neb., 826.) Somewhat akin to these cases, and based on the same principle, are those which hold that where the court gives an instruction purporting to state to the jury all the elements necessary

to a verdict such instruction is erroneous if it fails to include all such necessary elements. (*McPherson v. Wiswell*, 19 Neb., 117; *Runge v. Brown*, 23 Neb., 817; *Gilbert v. Merriam & Roberson Saddlery Co.*, 26 Neb., 194; *Bowie v. Spaids*, 26 Neb., 635; *City of Plattsmouth v. Boeck*, 32 Neb., 297.)   On the other hand, a verdict will not be set aside merely because the charge was couched in too general language, unless by appropriate request a more specific instruction was asked. (*Sioux City R. Co. v. Brown*, 13 Neb., 317.)   It has also been held that while a party, without a particular request therefor, has a right to have the jury instructed generally upon the issues in the case, still complaint cannot be made of the failure to present some particular phase of the case unless he has requested a proper instruction upon the subject. (*Sioux City & P. R. Co. v. Finlayson*, 16 Neb., 578; *German Nat. Bank v. Leonard*, 40 Neb., 676; *York Park Building Association v. Barnes*, 39 Neb., 834; *Hill v. State*, 42 Neb., 503; *Housh v. State*, 43 Neb., 163.)   In *Grim v. Robinson*, 31 Neb., 540, it was said that an instruction was erroneous for not stating all the questions arising in the case; but an inspection of that case discloses that the court held the instruction referred to erroneous for what it contained and because it withdrew from the jury a material issue.

The foregoing cases are fairly illustrative of, if they do not comprise, all this court has said bearing on the subject under discussion, and from them we deduce the rule that it is error for the trial court to fail entirely to instruct the jury on the law of the case, whether requested so to do or not; that it is likewise error to partially instruct the jury, but by the omission of certain elements impliedly to withdraw from the attention of the jury an issue or element in the case necessary to determine the rights of the parties, and that an exception to instructions so partially stating the case covers the error of omission, but that when the jury is instructed, and when the instructions given do not

impliedly withhold from the jury some of the issues or elements proper for their consideration, error cannot be predicated upon the fact that the court failed to charge upon some particular phase of the evidence, or some particular feature of the case, unless a proper instruction was offered by the party complaining. This rule is in accordance with the general current of authorities, a good collation of which may be found in 11 Am. & Eng. Ency. of Law, pp. 251–258.

The failure to instruct the jury upon the effect of the evidence of Gothman's marriage did not withdraw from them any issue in the case, directly or by implication. Such an instruction, if given, would only guide the jury in weighing one feature of the evidence in connection with issues fully placed before the jury in other instructions. If the defendant had a right to such an instruction he should have requested it. The proper time to make the request is when the evidence is concluded, and the proper manner of making it is by submitting in writing the instruction desired. (Criminal Code, sec. 478.) We cannot regard the casual statement by the judge during the trial that he would so instruct as anything more than an expression of his disposition to do so if properly requested. It certainly did not obviate the necessity for a proper request. A request and a refusal being, therefore, necessary in order to present the right to such an instruction, and no exception having been taken at the time to the failure to give such an instruction, and the matter not having been called to the attention of the trial court in the motion for a new trial, no error on this ground appears.

Instructions numbered 16, 17, 18, and 19, relating to self-defense, are in the briefs complained of as erroneous. The argument relates largely to the effect of the four instructions taken together, but error is assigned in such a manner as to permit a review of each instruction. These instructions are as follows:

"16. The jury are instructed that the rule of law on the subject of self-defense is this: Where a man, in the lawful pursuit of his business, is attacked, and when, from the nature of the attack, there is reasonable ground to believe there is a design to take his life, or do him great bodily harm, and the party attacked does so believe, then the killing of the assailant under such circumstances will be excusable or justifiable homicide, although it should afterward appear that no injury was intended and no reasonable danger existed. It is enough that there be an apparent danger: such an appearance as would induce a reasonable person in defendant's position to believe that he was in immediate danger of great bodily injury. Upon such appearances a party may act with safety; nor will he be held accountable though it should afterward appear that the indications were wholly fallacious, and that he was in no actual peril. The rule in such cases is this: What would a reasonable person, a person of ordinary caution, judgment, and observation, in the position of the defendant, seeing what he saw, and knowing what he knew, suppose from this situation and these surroundings? If such reasonable person, so placed, would have been justified in believing himself in imminent danger, then the defendant would be justified in believing himself in such peril, and in acting upon such appearance.

"17. The jury are instructed that while a person has the right, when assaulted by another in such a manner as to excite in him a reasonable belief that he is in danger of losing his life or receiving great bodily injury, to resist the attack by using such force as is apparently necessary to defend himself, yet if, after he has secured himself from danger, he takes the life of his assailant in a spirit of revenge, or for some unlawful purpose, he cannot claim exemption from punishment on the ground of self-defense.

"18. The jury are instructed that in considering whether the killing was justifiable on the ground that the killing

was in self-defense, they should consider all the circumstances attending the killing, the character, number, and place of the wounds, the conduct of the parties at the time and immediately prior thereto, and the degree and nature of the force used by the defendant in making what is claimed 'to be this self-defense, as bearing upon the question whether the shots, if fired, were actually shot in self-defense, or whether they were shot in carrying out an unlawful purpose; and if the jury believe from the evidence, beyond a reasonable doubt, that the force used was unreasonable in amount and character, and such as a reasonable mind would have so considered under the circumstances, it is proper for the jury to consider that fact, if it is proven, in determining whether the killing was in self-defense.

"19. The jury are instructed that the law of self-defense does not imply the right of attack, nor will it permit of acts done in retaliation or for revenge. Therefore, if the jury believe from the evidence that the defendant sought, brought on, or voluntarily entered into a difficulty with the deceased, August Gothman, for the purpose of wreaking vengeance upon him, or to accomplish some unlawful purpose, or if the jury shall find and believe from the evidence that he killed the deceased at a time when he had, because of the acts of the deceased, no reasonable apprehension of immediate and impending injury to himself, and did so to accomplish some unlawful purpose, or did it from a spirit of retaliation and revenge for the purpose of punishing the deceased for past threatened injuries done to him, the defendant, then the defendant cannot avail himself of the law of self-defense. Before a person can justify taking the life of a human being on the ground of self-defense he must, when attacked, employ all reasonable means within his power, consistent with his own safety, to avoid the danger and avert the necessity for the killing."

The first objection urged to these instructions is that

they placed before the jury the law of self-defense in such a manner as to lead the jury to believe that, although the shooting were in self-defense, the defendant would be guilty if actuated by malice. Inasmuch as the instructions told the jury very plainly that self-defense rendered homicide excusable, we cannot see how the instructions can be given the prejudicial effect claimed by the defendant. By another instruction the jury had been told in apt terms what constituted malice. We cannot see how self-defense and malice could combine, nor how, under the instructions, it was possible for the jury to believe they could coexist. The jury was instructed that in order to make out a case of self-defense the shooting must be for the purpose of self-preservation, and they were also told that in order to be malicious the shooting must have been from an unlawful and unjustifiable motive. We think that these rules are correct; and to say that a shooting is in self-defense and at the same time malicious is a contradiction in terms. To have told the jury that if the facts constituting self-defense existed the defendant should be acquitted, although the homicide were malicious, would be equivalent to saying that under some circumstances murder is not murder in the eye of the law.

The objection urged to the seventeenth instruction is that it left the jury to infer that the killing would not be excusable if done after the defendant had secured himself from danger, although he might still entertain a reasonable belief that the danger continued. The language of this instruction was taken almost verbatim from *Davis v. State*, 31 Neb., 240. It is true that the court was not then considering a contingency precisely similar to the one proposed here in argument. But we think the rule as stated properly provides for such a contingency. The language is not merely that the defendant cannot claim exemption from punishment, if after he secures himself from danger, he takes the life of his assailant. There are qualifying words

which remove any inference that the fact alone of security would render the homicide punishable. In order to render it punishable the jury was told that the homicide must be committed in a spirit of revenge or for some unlawful purpose, and in the rest of the instructions the jury had been told that the purpose of self-preservation from apparent danger, based on reasonable grounds for belief, was a lawful purpose.

As to the nineteenth instruction it is urged that it was erroneous because not based on the evidence; that the word "difficulty" was too general, and that there was no evidence that Carleton had brought on a difficulty with the deceased. As to the term "difficulty" it is argued that the jury might infer that Carleton's harboring or marrying Minnie was bringing on a "difficulty" within the meaning of the instruction, or that the jury might consider some other antecedent and independent fact as the bringing on of a "difficulty." We do not think so. Instructions, of course, must be critically examined, but there should be no over-refinement or hair-splitting in their analysis. We think the plain and unmistakable import of the language was that the law of self-defense could not be availed of if Carleton, for the purpose of wreaking vengeance on Gothman, provoked an attack of a physical character. It is true there is no direct evidence of any such state of affairs, nor was there any direct evidence that the shooting was in self-defense. Carleton's testimony is not that he fired at first in self-defense, but that the pistol was twice discharged accidentally, and then he continued to shoot, or try to shoot, after he obtained possession of the pistol and while Gothman lay on the floor. It is probable that the testimony as to the last fact was sufficient direct testimony to require the submission of the theory of self-defense to the jury. If the defendant had not been upon the stand at all, the circumstances in evidence might have been sufficient to so require. But the theory of self-defense hav-

Carleton v. State.

ing been so introduced into the case, the whole of the law
upon the subject, so far as it applied to the facts, to the ex-
tent which they might reasonably be inferred from the
circumstances as well as from direct evidence, was properly
stated.  The jury was not required to accept the defend-
ant's testimony as true, and if they rejected it they might
base their conclusions upon the circumstances in evidence,
and these circumstances certainly warranted as much a be-
lief that the attack was made or provoked by Carleton as
that it was made or provoked by Gothman.

The second objection urged to the nineteenth instruction
is that it proposes to the jury that their belief contrary to
the theory of self-defense was sufficient to a conviction,
without stating to them that their belief of guilt must be
beyond a reasonable doubt.  In other words, that it was
erroneous to establish a test of the jury's belief without
stating the degree of certainty required.  In support of this
objection we are cited to the case of *Ballard v. State*, 19
Neb., 609; but when we turn to that case we find that the
language of the instruction there held erroneous was: "If
you are satisfied from the evidence that the defendant was at
the time of the killing insane,  *  *  *  then you should
acquit." It will be seen that that language required the jury
to be satisfied by at least a preponderance of the evidence of
the innocence of the defendant, while the language of the
instruction in question is in effect that if the jury believed
from the evidence that the act was committed in the ab-
sence of facts constituting the defense in question he should
be convicted.  In one case the instruction placed the de-
fense before the jury as a matter for affirmative proof.  In
the other it required for a conviction that the state should
exclude the facts constituting the defense.  The instruction
is not, therefore, open to the objection sustained to the in-
struction in the Ballard case.  In this case the jury was
over and over again impressed with the necessity of being
satisfied beyond a reasonable doubt of the defendant's guilt,

and in at least five places they were expressly or by plain implication told that the state must make out every essential feature beyond a reasonable doubt. We do not think that after having once impressed this fact upon the jury it was necessary in every instruction to repeat it. As opposed to this view counsel cited us to certain cases holding that if the court misstates the law in one instruction the error is not cured by a correct statement in another. Among such cases are *Wasson v. Palmer*, 13 Neb., 376; *Ballard v. State, supra; Fitzgerald v. Meyer*, 25 Neb., 77; *School District v. Foster*, 31 Neb., 501. But these were all cases where the instruction complained of misstated the law. On the other hand, where an instruction is simply incomplete, so that taken by itself it might operate to mislead, another instruction complementary thereto and stating the proper limitations and conditions cures the error which might otherwise exist in the first instruction. The charge is to be taken together, and when the instructions taken as a whole, without conflict or confusion, state the law, error cannot be predicated upon the fact that any one of them was in itself, and unexplained, incomplete and calculated to mislead. (*Sioux City & P. R. Co. v. Finlayson*, 16 Neb., 578; *Gray v. Farmer*, 19 Neb., 69; *St. Louis v. State*, 8 Neb., 405; *Murphy v. State*, 15 Neb., 383; *Bartling v. Behrends*, 20 Neb., 211; *Campbell v. Holland*, 22 Neb., 587; *City of Lincoln v. Smith*, 28 Neb., 762; *St. Paul Fire & Marine Ins. Co. v. Gotthelf*, 35 Neb., 351; *Krchnavy v. State*, 43 Neb., 337.) Measured by this rule, there was no error in the instruction.

Another instruction of which complaint is particularly made is the tenth, which is as follows:

"10. The jury are instructed that while the law requires, in order to constitute murder in the first degree, that the killing shall be done purposely and of deliberate and premeditated malice, still it does not require that the premeditation and deliberation, or the willful intent and

purpose, shall exist for any length of time before the crime is committed; it is sufficient if there was such design and determination to kill distinctly formed in the mind at any moment before or at the time the blow is struck or the fatal shot is fired; and in this case, if the jury believe from the evidence, beyond a reasonable doubt, that the defendant feloniously, purposely, and of his deliberate and premeditated malice, shot and killed the deceased in manner and form as charged in the information, and that before or at the time the shot was fired, the defendant had formed in his mind a willful, malicious, deliberate, and premeditated design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design or purpose, and without any justifiable cause or legal excuse therefor, then the jury should find the defendant guilty of murder in the first degree. To constitute murder in the first degree there must have been an unlawful killing of a person, done purposely and with deliberate and premeditated malice. If a person has actually formed the purpose maliciously to kill, and has deliberated and premeditated upon it before he performs the act, and then performs it, he is guilty of murder in the first degree, however short the time may have been between the time of forming the purpose and the time of its execution. It is not the length of time intervening between the time of the formation of the purpose and the time of the actual killing which constitutes the distinctive difference between murder in the first and in the second degree. An unlawful killing, done purposely and with deliberate and premeditated malice, constitutes the crime of murder in the first degree, while murder in the second degree consists in an unlawful killing, done purposely and maliciously, but without deliberation and premeditation. To constitute murder in the first degree it matters not how short the time may be between the time of the formation of the purpose to kill and its execution, if the party has turned it over in his mind—that is, weighed and deliberated upon it."

Carleton v. State.

The first objection urged to this instruction is directed to that portion of it which says that in order to constitute murder in the first degree "it is sufficient if there was such design and determination to kill distinctly formed in the mind at any moment before or at the time the blow is struck or the fatal shot is fired." This language, if it stood alone, might be ambiguous and objectionable, as possibly implying that it would be murder in the first degree if the intent were formed simultaneously with the infliction of the wound; but by the latter portion of the instruction it clearly appears that the intent must have been formed, and that there must have been deliberation and premeditation before the act was performed, and also that there must have been a turning over in the mind, "a weighing and deliberation." And by the twelfth instruction it was stated, "If an intention to kill exists, it is willful; if this intention be accomplished by such circumstances as evidence a mind fully conscious of its purpose and design, it is deliberate. Premeditate means to think of in advance; to determine upon beforehand. It means that there was a design to kill before the act of killing took place." This was a clear and explicit statement that, in order to constitute the act one of premeditated and deliberate malice, the intent to perform it must have preceded the performance and that the mind must have beforehand considered it and determined upon it. The language complained of, therefore, could only mean that there had been formed in the mind an intent to kill, and that that intent existed so formed at the time the blow was struck. It is no doubt true that the terms "deliberation" and "premeditation" require some time for reflection, and that it is not sufficient that the intent to kill be formed simultaneously with the striking of the blow. (*Simmerman v. State*, 14 Neb., 568; *Milton v. State*, 6 Neb., 136.) But in the latter case it was said, "Where a person has actually formed the purpose maliciously to kill another, and has deliberated and pre-

meditated upon it before committing the offense, the length
of time that intervenes between the time such purpose is
formed and its execution is not material." In the same
case it is said that our statute was taken from Ohio, and
the court, therefore, follows the interpretation placed by
the Ohio courts upon the statute. A portion of a decision
quoted with approval in the Milton case is as follows:
" The intention to do the injury must have been deliber-
ated upon and the design to do it formed before the act
was done, though it is not required that either should
have been for any considerable time before." (*State v.
Turner*, Wright [O.], 30.) The instruction of the court
was, therefore, correct. The intent to kill must precede
the killing, and under such circumstances that there has
been a deliberation upon the subject, but it is not necessary
that the state should show that the intent existed and had
been deliberated upon for any particular period of time.
Indeed the defendant does not seriously combat this prop-
osition, but, in addition to contending that the portion of
the instruction referred to was opposed to this principle of
law, he also argues that the court by repetition rendered
too prominent the brevity of deliberation required. In
*Seebrock v. Fedawa*, 30 Neb., 424, it was said that a judg-
ment will not be reversed because the trial court repeated
in the instructions the same proposition of law where it
does not appear that the purpose was to mystify the jury
and that the jury was misled by reason thereof. And in
*Carstens v. McDonald*, 38 Neb., 858, it is said that the
giving of an instruction upon a subject already specifically
covered may be sufficient ground for reversal, but it will
not have that effect where it appears that the jury were
not thereby misled or confused, and *Seebrock v. Fedawa*
is cited in support of the rule. The two opinions were
written by the same judge, and were evidently intended to
state the same rule. In view of the latter case, *Seebrock
v. Fedawa* should not be construed so as to require for a

reversal that the court in repeating the instruction intended
to confuse and mislead the jury; and in view of the
former case, as well as the language of the opinion in the
latter, the syllabus in the latter should not be interpreted
to mean that prejudice will be presumed merely from repe-
tition in the instructions. The clear inference from both
cases is that a repetition of the same rule will not be ground
for reversal unless its effect was to mislead or confuse the
jury. (See on this point, also, *Hill v. State, supra.*) It is
true that in the court's charge in the case under considera-
tion it is several times stated in substance that no particular
length of time prior to the act during which the intention
to kill existed and was deliberated upon need be shown,
but this was each time in connection with a statement of
the elements necessary to constitute murder in the first de-
gree. The necessity of deliberation and premeditation was
impressed upon the jury. The limitation upon the idea
was given at the same time. The instructions did not con-
flict. The words repeated were not stated in such connec-
tion as to prejudice the rights of the accused, and we do
not think that the jury could have been misled or confused
thereby.

Instruction No. 15 was as follows:

" 15. The jury are instructed that the credit and weight
to be given to statements or declarations of the defendant
depend very much upon what the statements or declarations
are. If the crime itself as charged is proven by other testi-
mony, and if it is also proven that the party charged with
committing the crime was so situated that he had the op-
portunity to commit the crime, and his statements or dec-
larations are consistent with such proof, and corroborative
of it, and the witness or witnesses who swear to the state-
ments or declarations is or are apparently truthful, honest,
and intelligent, these statements or declarations so made
may be entitled to great weight with the jury."

This instruction is objected to on the ground that it

tended to impress the jury with the idea that greater weight should be attached to statements made by the defendant which were unfavorable to him than to statements which were favorable.   We can hardly defend the policy of giving instructions of this character, but we think this instruction had a tendency directly the opposite to that conceived by the defendant.   There were in evidence statements made by the defendant hereinbefore referred to, to the effect that he had shot a tramp, and implying at least that the act was on his part willful.   The court by this instruction cautioned the jury that they should weigh such statements in connection with the proof of other facts and the credibility of witnesses testifying to such facts, and that if the statements were consistent with such proof, and corroborative of it, they might be entitled to great weight.   This was in effect a charge that the statements were not entitled to great weight unless corroborative of the testimony in every particular.   The instruction was favorable to the prisoner instead of unfavorable.   That the statements and declarations referred to were those made by the prisoner out of court and not his testimony on the stand, and that this construction is the correct one and the one which the jury must have given it is apparent from reading the two instructions immediately preceding.   Both clearly referred not to his testimony but to statements out of court.   One of these is as follows: "The statements or declarations of the prisoner out of court should be acted upon by the jury with great caution, and unless they are supported by other evidence tending to show that the prisoner committed the crime they are rarely sufficient to warrant a conviction."   In this connection complaint is also made of the twenty-sixth instruction, which is as follows:

"26. The jury are instructed that they have no right to disregard the testimony of the defendant on the ground alone that he is a defendant and stands charged with the commission of a crime; nor are the jury required to blindly

receive the testimony of the defendant as true, but the jury are to fully and fairly consider whether it is true and made in good faith, and for this purpose the jury have a right to consider the interest of the defendant in this prosecution. The law presumes the defendant to be innocent until he is proved guilty by the evidence beyond a reasonable doubt, and the law allows him to testify in his own behalf, and the jury should fairly and impartially consider his testimony together with all the other evidence in the case, and if from all the evidence, the facts and circumstances proved, the jury have any reasonable doubt of the guilt of the defendant as charged in the information, then the jury should give the defendant the benefit of the doubt and acquit him."

Objection is made to two phrases therein; one is that the jury is not required to " blindly " receive the testimony of the defendant as true, and the other is that they should consider whether it was " made in good faith." We can see no possible objection to this language. It states the law and states it correctly. The instruction as a whole is certainly not unfair to the defendant, and the use of the word " blindly " in connection with the rest of the instruction implied no disbelief by the court. As to the expression in regard to " good faith," the argument is that if the jury believed his testimony to be true it made no difference whether it was given in " good faith " or in " bad faith." With all due respect to the learned counsel representing the defendant, and while duly appreciating the ability they have displayed in the defense, we may be pardoned for saying that the distinction sought to be drawn is at least over-nice. If the defendant's story was true, it was for that reason given in good faith. If it was false, then it was in bad faith because it was false. "True" and in " good faith," used in such a connection, are necessarily convertible terms, and while it was not necessary to use both it was beyond all possibility that the jury could have been

led by their use to believe that the defendant's testimony was true, but nevertheless given in bad faith and therefore to be rejected.

A very vigorous argument is directed against instruction numbered five, defining reasonable doubt. This instruction was as follows :

"5. The jury are instructed that a reasonable doubt is a term often used, probably well understood, but not easily defined. It is not every possible doubt, because everything relating to human affairs, and depending on moral evidence, is open to some possible doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say and feel that they have an abiding conviction to a moral certainty of the truth of the charge. If upon the proof there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal, for it is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances, that the facts charged are more likely to be true than the contrary, but the evidence must establish the facts to a reasonable and moral certainty,—a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it. This is proof beyond a reasonable doubt; because if the law, which mostly depends upon considerations of a moral nature, should go farther than this and require absolute certainty, it would defeat criminal prosecutions altogether. A reasonable doubt does not consist of possible or conjectural doubts. If after a careful, impartial, and candid consideration of all the evidence in this case the jury have an abiding conviction of the guilt of the defendant, and are fully satisfied of the truth of the charge against him, then they are satisfied beyond a reasonable doubt."

The language of that instruction was taken almost

bodily from the charge of Chief Justice Shaw in the case
of Commonwealth v. Webster, 5 Cush. [Mass.], 295. In-
structions in substance the same as this have been approved
in several cases in this state (Polin v. State, 14 Neb., 540;
Langford v. State, 32 Neb., 782; Willis v. State, 43 Neb.,
102); and in two cases where other instructions on the sub-
ject had been given, the court has taken occasion to com-
mend the charge of Chief Justice Shaw upon the subject.
(Cowan v. State, 22 Neb., 519; Carr v. State, 23 Neb., 749.)
The instruction in its general effect has, therefore, the sup-
port of the former adjudications of this court, and the only
reasonable ground of criticism is to that portion of it which
says that if the law, " which mostly depends upon consider-
ations of a moral nature, should go further than this and
require absolute certainty it would exclude circumstantial
evidence altogether." It is claimed that this portion of the
instruction is argumentative and for that reason vicious.
It is somewhat argumentative, but only in the way of giv-
ing a reason for a rule of law. It is not argumentative
upon the evidence, nor was it at all prejudicial to the rights
of the accused. In Long v. State, 23 Neb., 33, certain in-
structions were criticised because containing a mixture of
law and argument. But the argument in those instructions
was addressed to the credit which should be given witnesses,
a subject exclusively for the jury, and there were also com-
ments on the public policy of convictions, and the public
danger resulting from turning criminals loose. Such a
charge in the first respect infringed upon the province of
the jury, and in the second respect it appealed to influences
wholly improper for consideration. The clause particularly
complained against in the instruction we are considering
might properly have been omitted, but it was not a com-
ment upon the facts; it was not an appeal in any sense to
the jury. It merely stated in cold terms a sufficient reason
for not requiring an impossible degree of proof, and that
by way of explaining and enlightening the rule of law re-

ferred to.   It is argued that the expression that to require
absolute certainty "would defeat criminal prosecutions
altogether" was an intimation to the jury that this prose-
cution should not be defeated.   We do not think so.   The
language was general, and in so far as it expressed a prin-
ciple of public policy, to-wit, the necessity of effective
prosecutions, this was a principle which must have been in
the minds of the jury as strongly before as after the in-
struction was read.   In *Ballard v. State,* 19 Neb., 609,
the jury was told that if they should find the defendant
insane then they should acquit him, "and turn him loose."
The same argument as here used was urged against the ex-
pression "turn him loose."   That language was certainly
much more objectionable than this, inasmuch as it involved
the idea of the danger of turning loose upon the public an
insane person of homicidal tendencies; but even there the
language used was not considered sufficient in itself to justify
a reversal.

Instructions 20 and 21 relate to the purpose and effect
of evidence in regard to the character of the deceased.   We
will not quote them for the reason that they state substan-
tially the rule upon the subject as deduced from the au-
thorities as hereinbefore set out in discussing the evi-
dence.   It is claimed that error lay in the instructions
because they confined the evidence in its application to the
good faith of defendant's belief of danger, and because they
required as a antecedent to its consideration that there
should be some evidence tending to show an attack by the
deceased.   In these respects the instructions were right.
The ferocity or violent disposition of the deceased could be
no more used alone to establish that an attack had been
made by him than similar traits on the part of the defend-
ant could be proved for the purpose of establishing that he
was the guilty person.   The evidence only became material
when accompanied by some evidence of an attack, and this
for the purpose of showing defendant's state of mind as

well as the probable character of the attack as it appeared
to the defendant. These elements the instructions properly
submitted to the jury.

In the motion for a new trial several assignments relate
to alleged misconduct on the part of jurors. The acts com-
plained of range themselves in four classes. First—That
some of the jurors, contrary to their examination on *voir
dire*, had formed and expressed opinions as to the guilt of
the defendant. Second—That the jury had been wrong-
fully allowed to separate. Third—That some of them had
partaken of intoxicating liquors. Fourth—That one had
secretly taken notes of the evidence and read the same to
the others during their deliberations. As to the first and
fourth classes of objections, it is sufficient to say that the
evidence in support thereof consisted almost entirely of the
statements of third persons, as to declarations made by the
jurors after the jury was discharged; that this evidence
was met by direct and positive contradiction both as to the
declarations and the facts. Testimony to impeach a ver-
dict in such a manner should be received with great cau-
tion, and the evidence being conflicting the finding of the
trial court will not be disturbed. (*Hill v. State*, 42 Neb.,
503.) As to the alleged separation of the jurors, there is
no evidence showing any separation except what was ren-
dered necessary by physical demands, an officer in such
case accompanying the juror who separated from his com-
panions. As to the drinking of intoxicating liquors, it
appears that after some of the jurors had been examined
on their *voir dire*, and before the jury was sworn or com-
pleted, a bottle of whiskey was found in the possession of
one juror who had been passed for cause and who ulti-
mately served on the jury. This was at once taken away
from him by the sheriff. The mere fact of the possession
of this whiskey before the jury was sworn would certainly
not vitiate a verdict. There is some evidence tending to
show that the juror in question had been drinking before

Carleton v. State.

the bottle was taken away. These facts are, however, all denied, and the finding of the trial judge will not be disturbed. It is not necessary, therefore, to consider whether the drinking of intoxicants at that stage of the case would invalidate the verdict.

A strong effort was made to secure a new trial on the ground of alleged misconduct of one Smith. The evidence on this point tends to show that Smith's name was indorsed on the information as a witness for the state; that he had been subpœnaed and was in attendance during the trial until about the close of the state's case, when he was discharged from attendance without being placed on the stand; that during the trial he approached Mrs. Wood, the mother of the defendant, and endeavored to ascertain from her what the defense would be, and made some suggestions as to what might be proved; that during the trial Smith was seen in conversation with several of the witnesses, among them Henry Lucke. On this slender basis the defense tried to make out that Smith, of his own volition, or at the procurement of some one, sought to influence the testimony, particularly that of Lucke. In other words, that he suborned perjury. This is a very serious charge, and the evidence signally failed to establish it.

Complaint is also made because Henry Lucke, before the trial, misled the defense as to his testimony by not stating the remark made by Carleton about getting away with Gothman. We have never heard that the failure of a witness for the state to disclose, upon inquiry by the defense, what his testimony would be, is ground for a new trial. In such a case a party might be so surprised as to warrant, on proper application, interference by the court for his protection, but it appears that the trial lasted several days, and that the county attorney, in his opening statement to the jury, stated according to the facts what Lucke's testimony would be. This gave every opportunity to cross-examine all the witnesses on the basis of such statement,

and certainly gave reasonable opportunity to meet the testimony. No application for a postponement of the trial was made.

We think we have now covered every point made by counsel in argument or in the briefs, and we have considered the assignments of error, whether referred to. or not. We find no error in the record, and the judgment of the district court is

AFFIRMED.