ALVIN HANS, PLAINTIFF IN ERROR, V. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

22 N. W. 2d 385

FILED MARCH 29, 1946. No. 31992.

*Eugene J. O'Sullivan, Arthur J. Whalen,* and *Ernest S· Priesman,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Homer L. Kyle,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEA-GER, CHAPPELL, and WENKE, JJ.

MESSMORE. J.

Alvin Hans was informed against and charged with the crime of foeticide under section 28-404, R. S. 1943. He was convicted and sentenced to serve an indeterminate sentence of not less than one year or more than five years in the penitentiary. From the sentence so imposed, he prosecutes error.

For convenience, the plaintiff in error will hereafter be referred to as defendant.

Defendant contends that section 6 of the Nebraska Criminal Code of 1873, now section 28-404, R. S. 1943, upon

which the information in the instant case is grounded, was and is unconstitutional and in violation of that part of section 19, article II (now a part of section 14, article III), of the Constitution of the state of Nebraska in force when the law was passed, the same being: "No bill shall contain more than one subject, and the same shall be clearly expressed in the title."

Reference is made to volume 2, Complete Session Laws of Nebraska, 1866-1877, p. 647, which reads in part as follows:

"LAWS OF NEBRASKA
Part 1.—CRIMINAL CODE
Code of Criminal Procedure.
AN ACT to establish a criminal code.
Be it enacted by the Legislature of the State of Nebraska, in manner and form following, that is to say:
Part 1—CRIMES AND OFFENSES
* * * * *
Chapter II.—HOMICIDE AND FOETICIDE."

We quote the following section only:

"Sec. 6. Any physician, or other person, who shall administer, or advise to be administered, to any pregnant woman with a vitalized embryo, or foetus, at any state of utero gestation, any medicine, drug, or substance whatever, or who shall use or employ, or devise to be used or employed, any instrument or other means with intent thereby to destroy such vitalized embryo, or foetus, unless the same shall have been necessary to preserve the life of the mother, or shall have been advised by two physicians to be necessary for such purpose, shall, in case of the death of such vitalized embryo, or foetus, or mother, in consequence thereof, be imprisoned in the penitentiary not less than one nor more than ten years."

The language of section 6, *supra*, is identical with the language now appearing in section 28-404, R. S. 1943.

The argument advanced by the defendant is that chapter 2, subtitle of the act, *supra*, specifically relates to homicide and foeticide; that no place in the title of the act is the killing of a vitalized embryo referred to by the use of any

appropriate descriptive language.

The words "foeticide" and "embryocide" are medicolegal terms, and the words "vitalized embryo" and "foetus," are not synonymous, but mean different things in medicine, signifying two possible stages of development after conception and before birth. The distinction between the two words, as contended for by defendant, is reflected in the following medical definitions:

An embryo is "the rudimentary plant in the seed; the product of conception during its intrauterine existence; its first two weeks constitute the ovum stage; from the end of the 2nd to the beginning of the 8th week is the embryonal stage, and from the beginning of the 3rd month to the termination of gestation is the fetal stage." Stedman's Medical Dictionary, (14th ed.), p. 350.

A foetus (fetus) is defined, "The unborn young of an animal after it has taken form in the uterus; in man, the product of conception from the end of the third month to the moment of birth." Stedman's Medical Dictionary, (14th ed.), p. 401.

Therefore, defendant contends: If the words "foetus" and "vitalized embryo" are not defined in the statute creating offenses, their general medical meaning and sense as applied should prevail. The offenses could or should be properly set forth in legislative enactment to inform a defendant of which offense he is charged. The statute having failed in such respect, the constitutional provision, *supra*, has been violated.

We are not in accord with the defendant's contention. While arbitrary distinction is made by some writers between "foetus" and "embryo," the distinction is not recognized in a charge of "foetcide." We make reference to the following legal definitions: "Foetus. In medical jurisprudence. An unborn child. An infant in ventre sa mere." Black's Law Dictionary, (3rd ed.), p. 794.

Foeticide (feticide) in medical jurisprudence means: "Destruction of the fetus; the act by which criminal abortion is produced." Black's Law Dictionary, (3rd ed.), p.

769. See, also, 1 Beck, Medical Jurisprudence, 288; Guy, Medical Jurisprudence, 133; 36 C. J. S., Feticide, p. 732.

Section 28-404, R. S. 1943, uses the language: " * * * to any pregnant woman with a vitalized embryo, or foetus, at any stage of utero gestation, * * * ." The statute making the offense "at any stage of utero gestation" means at any stage during pregnancy. See Edwards v. State, 79 Neb. 251, 112 N. W. 611. See, also, 1 C. J. S., Abortion, § 6, p. 318.

It is clear that the arbitrary and technical distinction between the terms "embryo" and "foetus" are not recognized by the law. The terms are practically interchangeable and refer to an unborn child, in ventre sa mere. It is obvious the Legislature used these terms in their ordinary and commonly accepted meaning, and when it used the term "foeticide" it meant the unlawful destruction of an unborn child, in ventre sa mere, at any stage of gestation.

We conclude section 28-404, R. S. 1943, is not violative of that part of the state Constitution now section 14, article III, as contended for by defendant.

The defendant advances the same argument, claiming he was denied due process of law under section 3, article I, of the state Constitution, and section 1, article XIV, of the Amendments to the Constitution of the United States. We conclude that for the reasons previously given this further contention of the defendant is without merit.

The defendant contends the information does not charge a crime under the laws of this state. The argument advanced by the defendant in this respect has been previously determined, and likewise the contention that defendant has been denied due process of law.

Further contention is made by the defendant that the information is not worded in the language of the statute, or language of similar import, but is vague, indefinite, and uncertain, and pleads conclusions and does not set forth facts constituting an offense. It would serve no useful purpose to set out the information in this opinion, which we have carefully considered.

The defendant directs our attention to the fact that in the information the word "and" has been substituted for the word "or" in certain instances, and the word "thereby" was omitted after the word "intent." We believe the language of the statute has not been distorted where it says if certain acts are done "with intent thereby to destroy," and the information charges such acts were done with intent to destroy. Nor is the defendant prejudiced where the statute reads: " * * * unless the same shall have been necessary to preserve the life of the mother, or shall have been advised by two physicians to be necessary * * * ," and the information reads: "the same not being necessary to preserve the life of the said Lucille Nicholson, the mother, and not having been advised by two physicians to be necessary * * * ."

We believe the information charges the defendant of an offense substantially in the wording of the statute, and when a charge is so made, it is sufficient.

"When an information alleges all the facts or elements necessary to constitute the offense described in the statute and intended to be punished, it is sufficient." McKenzie v. State, 113 Neb. 576, 204 N. W. 60; Chadek v. State, 138 Neb. 626, 294 N. W. 384; Veneziano v. State, 139 Neb. 526, 297 N. W. 920; Hunt v. State, 143 Neb. 871, 11 N. W. 2d 533.

In Smith v. State, 72 Neb. 345, 100 N. W. 806, it was held: "In charging the commission of an offense in an information, it is not necessary that the exact words of the statute be used, provided the words employed are the equivalents in meaning of those contained in the statute. Whitman v. State, 17 Neb. 224.

"The court will give the words used in the information their ordinary and commonly accepted meaning, and, when viewed in this light, if the words employed mean the same thing as those found in the language of the statute denouncing the offense, the information will be upheld." See, also, Whitman v. State, 17 Neb. 224, 22 N. W. 459; Kirk v. Bowling, 20 Neb. 260, 29 N. W. 928; Hodgkins v. State, 36 Neb.

160, 54 N. W. 86; Bartley v. State, 53 Neb. 310, 73 N. W. 744; Carrall v. State, 53 Neb. 431, 73 N. W. 939.

Also, in this assignment of error, the defendant contends that section 11, article I, of the state Constitution relating to the right of an accused in a criminal prosecution to be informed of the nature and cause of the accusation against him, was violated. The foregoing authorities sufficiently terminate such contention.

The defendant predicates error upon the giving of instruction No. 5 by the court.

Instruction No. 5 sets forth the elements necessary to be established by the evidence beyond a reasonable doubt in order to convict the defendant of the crime charged in the information. The criticism of the instruction is that it omits an essential element of the offense charged as contemplated by section 28-404, R. S. 1943, that is, that "the death of such vitalized embryo, or foetus" in consequence of the use of instruments or other means by the accused. Therefore, it is urged that instruction No. 5 submitted to the jury the wrong charge, that is, a charge as contained in section 28-405, R. S. 1943, an entirely separate offense, as follows: "Any physician or other person who shall willfully administer to any pregnant woman any medicine, drug, substance, or thing whatever, or shall use any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, or shall have been advised by two physicians to be necessary for that purpose, shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding five hundred dollars, or by both." While under section 28-404, R. S. 1943, it is contended that the vitalized embryo or foetus must have been killed before a conviction under such section may be had.

In determining whether instruction No. 5 is prejudicially erroneous, it is necessary to consider the instructions as a whole. In this connection instruction No. 2 sets forth the charge as contained in the information, which we have ap-

proved. Instruction No. 3 sets forth the offense as contained in section 28-404, R. S. 1943. Instruction No. 7 covers the elements of the offense as contemplated by section 28-404, R. S. 1943, with reference to intent being an essential element of the offense. Instruction No. 10 sets forth that "The terms 'vitalized embryo' and 'vitalized foetus' as used in the Statute above quoted, are practically synonymous terms and have substantially the same meaning, * * * ; and the term 'uterogestation,' as used in the Statute, means any state of pregnancy."

"The charge is to be taken together, and when the instructions taken as a whole, without conflict or confusion, state the law, error cannot be predicated upon the fact that any one of them was in itself, and unexplained, incomplete and calculated to mislead." Carleton v. State, 43 Neb. 373, 410, 61 N. W. 699, 712.

In Bartley v. State, 53 Neb. 310, 73 N. W. 744, this court held: "Instructions must be construed together, and if then they correctly announce the rule applicable to the issues and evidence, they will be upheld, even though a single paragraph, standing alone, might be faulty."

Measured by the foregoing rules, instruction No. 5 is not prejudicially erroneous.

Instruction Nos. 6 and 7 are criticized, but our examination discloses that each contains a harmless imperfection.

"Harmless imperfections in single instructions are not sufficient grounds for the reversal of a judgment, where the entire charge to the jury fairly states the law applicable to the issues and the evidence." Gillan v. Equitable Life Assurance Society, 142 Neb. 497, 6 N. W. 2d 782; on rehearing, 143 Neb. 647, 10 N. W. 2d 693, 148 A. L. R. 496. See, also, Bancroft v. Kite, 142 Neb. 178, 5 N. W. 2d 196; Shiman Bros. & Co. v. Nebraska Hotel Co., 146 Neb. 47, 18 N. W. 2d 551.

The defendant criticizes instruction No. 8, which informs the jury that the settled rule in this state is that even accomplices in the commission of crime are competent witnesses, and it is the duty of the jury to consider such testi-

mony, scrutinize it closely, give it the weight the jury determines it is entitled to after careful examination of such evidence in the light of other evidence in the case; further, that the jury should not rely upon it unsupported, unless it produces in the jury's minds the most positive conviction of its truth. It is proper for the jury to seek for corroborating facts and circumstances, but these are not absolutely essential. Defendant's contention is that the use of the language in the instruction, as follows: That although the jury may "seek for corroborating facts and circumstances but these are not absolutely essential," eliminates the requirement that the testimony of the complaining witness be corroborated by other evidence.

Although in some states the complaining witness in an abortion case must be corroborated the statute, section 28-404, R. S. 1943, does not make any such requirement. The matter is one for the Legislature and unless and until such corroboration is required by it, we hold the same is not essential.

"The woman upon whom the abortion was attempted is not an accomplice to the crime, and corroboration of her testimony is not essential." State v. Stafford, 145 Iowa 285, 123 N. W. 167. See, also, Commonwealth v. Wood, 11 Gray (Mass.) 85.

"Prosecutrix is not an accomplice of defendant charged with abortion, though the criminal operation was performed at her request or with her consent." State v. McCurtain, 52 Utah 63, 172 P. 481. See, also, 1 C. J. S., Abortion, § 35, p. 338.

We conclude the instruction is not prejudicially erroneous.

Defendant contends that the misconduct of the prosecuting attorney in procuring and having marked as state's exhibits nine to twenty inclusive, and keeping the exhibits before the jury on the pretense of eventually connecting them up in such a manner as to make them competent evidence, constituted prejudicial and reversible error when proper objections thereto were made. It is unnecessary to enumerate the exhibits. They were admitted in evidence.

Subsequently, on motion of defendant's counsel, the exhibits were withdrawn from the jury's consideration and the jury admonished to disregard entirely each and all of the exhibits and the evidence relating to same.

"Ordinarily, error in the admission of evidence is cured by withdrawing such evidence and directing the jury to disregard it." Wever v. State, 121 Neb. 816, 238 N. W. 736.

The following is quoted with approval from Wever v. State, *supra*: "This court held in McCormick v. State, 66 Neb. 337, and Robinson v. State, 71 Neb. 142, that error in the admission of evidence is cured by withdrawing such evidence and directing the jury to disregard it." See, also, Simmons v. State, 111 Neb. 644, 197 N. W. 398.

Under the circumstances we conclude that there was no prejudicial error.

Defendant contends that the complaining witness, Lucille Nicholson, in giving her testimony upon the trial disclosed that she was unworthy of belief, and committed willful and corrupt perjury as to material matters.

The complaining witness had her story reduced to writing first in a statement to the deputy county attorney, second at the preliminary hearing, and third, upon this trial. In her statement to the county attorney she said that she did not know and had never seen the man who aborted her until he picked her up in his automobile at 24th and St. Mary's Avenue, Omaha, Nebraska. She testified in the same manner in the county court at the preliminary hearing. At the trial, the first time she saw him, she testified, was on October 11 at 24th and Wirt Streets. The second time she saw him was on the 26th of October at 27th and St. Mary's Avenue. In her testimony at the preliminary hearing she did not know the exact number and location of the house in South Omaha where she was aborted. On the trial, she testified she did not know at first, but found out what the address was, 4401 R Street. In her statement to the county attorney she did not know what instruments were used on her or what was taken from her. At this trial she testified that the defendant used an instrument, that he

had something that looked familiar, a pair of scissors, which he used on her, and a foetus was taken from her. At the preliminary hearing she testified she had never been pregnant before. She filed a damage suit in the district court for Douglas County (Exhibit 2A) against defendant Alvin Hans et al., and in her petition filed in such case, alleged in paragraph six thereof that defendant, Alvin Hans, had committed an abortion on her on two separate and distinct occasions, to wit, on April 2, 1944, and on the 26th day of October the same year, by the use of instruments. The defendant contends that the filing of the petition in damages of April 30, 1945, 30 days after the jury returned a verdict of guilty in the instant case, discloses the testimony of the complaining witness is at variance in her statement to the county attorney, at the preliminary hearing, and in the instant case, especially as to the first time she had ever met or contacted the defendant, Alvin Hans, and constitutes a complete change of her testimony with reference to her first intimacy and illicit relations with the man named in the record; that under this set of facts, this court would be justified in finding that the complaining witness, Lucille Nicholson, committed perjury upon the trial of this case to lay a foundation for her damage suit.

The complaining witness was a girl 19 years of age, employed as an elevator operator. She was subjected to an extensive, exacting, and very thorough cross-examination, and it is true in some instances her testimony was at a variance. However, she did not deviate materially from the essential elements of her story. The following authorities are controlling:

"In criminal cases, as in civil, the credibility of witnesses and the weight to be given their testimony are matters for the determination of the jury. It is for the jury to determine whether it is convinced beyond a reasonable doubt of the defendant's guilt, not for the reviewing court to say whether it is so convinced. A reviewing court can only inquire whether the evidence was sufficient to warrant the jury in finding the defendant guilty." Carleton v. State,

43 Neb. 373, 61 N. W. 699.

"The fact that a witness testified differently in the preliminary examination and on the trial does not require that her testimony on the trial shall be rejected. Her credibility is for the jury." Dixon v. State, 46 Neb. 298, 64 N. W. 961. See, also, Reinhardt v. State, 101 Neb. 667, 164 N. W. 654.

We find no prejudicial error as contended for by defendant.

Defendant contends that the court, during the course of the trial, denied counsel for the accused to fully, fairly, and completely cross-examine on material matters witnesses produced against defendant by the state, which denial amounted to a deprivation of the constitutional right of the defendant of confrontation—the right to be confronted face to face by the state's witnesses—under section 11, articleI, of the Constitution of Nebraska, and a denial of due process of law, under section 3, article I, of the Constitution of Nebraska, and that part of section 1 of article XIV of the Amendments to the Constitution of the United States, which provides in part, " * * * nor shall any State deprive any person * * * liberty, * * * without due process of law."

The complaint is particularly addressed to the cross-examination of the state's witnesses, Lucille Nicholson and her sister Betty Spencer, the contention being that the trial court was too strict in limiting the cross-examination, and would not permit any inquiry or proof to be elicited in reference to the stories of these witnesses having been enlarged upon and amplified since they testified at the preliminary hearing which was reported, and at which time these witnesses professed to tell all they knew about the case.

While a witness may be interrogated on cross-examination with reference to sworn testimony given by him on the same matter on a former occasion, as at the preliminary hearing in an inferior court, on a prior trial of the same cause, or in a distinct action or prosecution, (See 70 C. J., Witnesses, § 1273, pp. 1077, 1078), the mode and extent of the cross-examination of a witness as to his statements on a former occasion rests in the sound discretion of the court.

See 70 C. J., Witnesses, § 1274, p. 1078.

Rulings restricting cross-examination are largely in the discretion of the trial court. See Andrews v. Commercial Casualty Co., 128 Neb. 496, 259 N. W. 653.

" 'The scope of the cross-examination of a witness rests largely in the trial court, and its ruling will be upheld, unless an abuse of discretion is shown.' Peterson v. State, 63 Neb. 251." Goemann v. State, 100 Neb. 772, 161 N. W. 421. See, also, Peterson v. State, 63 Neb. 251, 88 N. W. 549; DeVore v. Board of Equalization, 144 Neb. 351, 13 N. W. 2d 451; Welsh v. State, 60 Neb. 101, 82 N. W. 368.

From an analysis of the cross-examination, especially of the witnesses Lucille Nicholson and Betty Spencer, and in consideration of the foregoing authorities, we find that the trial court did not abuse its sound discretion with respect to cross-examination. We find no prejudicial error in such respect.

The defendant predicates error on the trial court overruling several motions and other pleadings filed, argued, and submitted by the defendant, as contained in the record. The principal contention in this assignment of error is apparently based on the trial court overruling the motion for new trial.

Section 25-1142, R. S. 1943, provides in part for a new trial on "newly discovered evidence, material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial; * * * ."

Paragraph 16 of defendant's motion for new trial follows the language of the statute. In support of this contention, Lucille Nicholson, the complaining witness, was called as a witness for the defendant, and exhibit 2A, a petition in a civil suit heretofore referred to, was introduced in evidence in behalf of the defendant. The purpose of this newly discovered evidence would be to impeach the complaining witness, and to discredit her testimony in the instant case.

"Generally, a new trial will not be granted for newly discovered evidence which, when produced, will merely impeach or discredit a witness who testified at the trial." 23

C. J. S., Criminal Law, § 1460, p. 1248. See, also, Ogden v. State, 13 Neb. 436, 14 N. W. 165; Kenyon v. State, 111 Neb. 175, 196 N. W. 143.

This court held, in Williams v. State, 113 Neb. 606, 204 N. W. 64: "A new trial will not ordinarily be granted, overruling the trial court, on the ground of newly discovered cumulative evidence or evidence which is merely impeaching in character." See, also, People v. Harris, 263 Ill. 406, 105 N. E. 303; 23 C. J. S., Criminal Law, § 1460, p. 1248, cases cited thereunder; and Baskins v. State, 139 Neb. 803, 299 N. W. 188.

The newly discovered evidence offered in the instant case is of an impeaching character, to discredit the complaining witness.

We conclude the newly discovered evidence offered in support of the motion for new trial is insufficient to warrant the granting of a new trial.

The defendant contends that the verdict of the jury is not sustained by sufficient evidence, and is contrary to law. In addition to certain parts of the evidence heretofore set forth, we believe in considering this assignment of error, the following additional material evidence is important.

The complaining witness, Lucille May Nicholson, 19 years of age, lived with her grandparents and a married sister at 3214 North 24th Avenue in the city of Omaha, Douglas County, Nebraska. She had been regular in her menstrual periods for several months prior to and including August 26 or 27, 1944. On or about September 3 or 4, 1944, on two or three occasions, she had sexual intercourse with a man. Her next menstrual period was due approximately on September 26 or 27, 1944, and did not occur. She was of good health at all times prior thereto. However, about two weeks prior to October 26, 1944, she was constantly sick at her stomach, morning and night, vomited on numerous occasions, and felt weak. She first met the defendant on or about the 11th or 12th of October, 1944, about two blocks distant from her residence, when he drove up in a maroon Buick car. She got into the car and had a conver-

sation with him in which she told him that she thought she was pregnant, and he asked her if she wanted to go to his place, to which she replied, no. Later, on October 26, 1944, at about 9:30 p. m., the defendant drove up in his car at 24th and St. Mary's Avenue where she met him, got into the car, and he drove her to a one-story frame house and basement known as 4401 R Street in South Omaha, Nebraska. He drove the car into the garage which is in the basement. To the north of the garage is a small room. The complaining witness identified the garage and room as shown by exhibit 1, the plat thereof drawn to scale, identified the furniture and equipment in the room, and marked the same on the exhibit.

After the defendant drove into the garage, he shut the garage doors, unlocked the door into the finished room which she had previously identified from the exhibit. Upon entering the room the complaining witness sat down, and the defendant proceeded to make certain preparations. There was a smaller room partitioned off from the larger room, and upon entering this room defendant told her to lie down on the table. She removed her underclothes, and he started to work on her womb near the vagina, by using an instrument which he inserted into the lower part of her body to spread her vagina, and also used scissors, and started cutting around inside her vagina. She could feel the cutting. She was in the room approximately five minutes at that time. She then got up and dressed. At that occasion she discharged water. The defendant then took her home. She next saw the defendant at about 9:30 p. m., in the evening of October 27, when he drove up in his car at 24th Street and St. Mary's Avenue. She got into the car and went out to 4401 R Street. When defendant got within a block of such place he turned off the lights to go into the garage, closed the garage doors, and they both got out of the car. He unlocked the door to the large room, and she went into the small room again. He administered a hypodermic to her, removed his coat and asked her if she had any money. She gave

him $50. He gave her a nightgown to put on. She laid down for a while and he administered another hypodermic. She does not remember what occurred after that. She remembers the defendant helping her off of the table about 1:30 in the morning. He helped her dress and took her to her mother's residence at 2201 Maple Street. She saw the defendant the next night, on October 28, 1944, at her mother's place, and went out to 4401 R Street again. He turned off the lights and drove into the garage. She went into the small room and he examined her. He then took her to her own home. She next saw him two or three days later, at her own home, 3214 North 24th Avenue, about 8:30 in the evening. He had a hypodermic needle wrapped in a towel, and administered to her. He then took her to 4401 R Street, gave her a hypodermic, and then took her home. She had no conversation with him, other than that she complained of pain and suffering. He advised her to use a hot water bottle on her stomach. This was on Halloween night, October 31, 1944.

The record further discloses that after the last menstrual period in August she next menstruated the second night that she was out at 4401 R Street. The nature of the menstruation was regular until the succeeding day. At about 1:30 or 2:00 a. m., on the morning of October 28, 1944, when the defendant let the complaining witness off of the table, there remained a shapeless mass of blood, approximately two inches in size. The following day there were small clots of blood.

Prior to October 26, 1944, the complaining witness had not seen any physician or surgeon, and was not advised that an operation was necessary. The first time she met the defendant, she met him as Dr. Hansen.

On cross-examination the complaining witness testified that the blood first appeared about the time of her regular menstrual period, the 27th of October; that it was of blackish hue and not similar to the color of blood which she had previously noted on such occasions, in that it was real dark red, and a large clot.

Her sister, Betty Jane Spencer, testified that she saw the defendant during the month of October 1944, and was with the complaining witness at the time he met her at 24th and Wirt Streets, and heard the conversation between the two. She again saw him on the 31st of October in her sister's room at their residence. He asked her for a half cup of hot water; he had in his hands a turkish towel, and when he unrolled it, had a hypodermic needle in it. She obtained the water and gave it to the defendant. Complaining witness was in bed and was sick. She seemed to be suffering pain in the lower part of her body.

Dr. William T. Rance called upon the complaining witness at the request of her mother, at her place of residence on the night of October 31, 1944. He found her in bed in evident severe pain in her lower abdomen, and noted that her pains were rhythmic or intermittent, and severe. Her mother told him what had happened. From the history, it was apparent that she was having uterine contractions, and there was an attempt made on the part of the uterus to throw its content, if any, out. He administered a hypodermic and placed ice packs on her stomach.

Dr. Rance, in response to a hypothetical question including the material facts as heretofore set out, stated that the complaining witness had some of the major symptoms of pregnancy. Likewise, Dr. S. McCleneghan answered a hypothetical question of like nature and gave his opinion that the complaining witness was pregnant.

The defense was an alibi.

On the contention that the evidence is insufficient, the principal reason given is that the evidence fails to show beyond a reasonable doubt that the complaining witness was pregnant at the time of the commission of the offense as set forth in the information, which fact, under section 28-404, R. S. 1943, constitutes an essential element of the offense and must be proved beyond a reasonable doubt before the defendant can be convicted.

On a prosecution for procuring the miscarriage of a pregnant woman, proof of pregnancy is essential. See 10 A. L.

R. 314, and cases cited.

We conclude the following authorities on the question of the sufficiency of the evidence to show pregnancy govern in the instant case:

In the case of State v. Stafford, *supra*, it was said: "Proof of pregnancy was essential under the statute defining the crime. State v. Stewart, 52 Iowa 284." This is true also under section 28-404, R. S. 1943.

Returning to State v. Stafford, *supra*, it is said: " * * * but absolute certainty is not exacted even in a criminal action. All necessary is that the evidence be such as to support the conclusion that the girl was enceinte beyond a reasonable doubt. She and the accused had been indulging in sexual intercourse for more than a year. She had missed her menses on December 25 or 26, 1908, and in January became convinced that she was in a family way, and so informed the accused. With that understanding the drug was procured and taken resulting in her serious illness January 20, 1909, when she was removed to her home, and during the first week in February discharged from her vagina a substance which she testified resembled a blood clot. She was in health, save that she had a cold in December, and the circumstance of missing her menstrual flow twice in succession is not otherwise explained. We are of opinion that the evidence was sufficient to carry the issue as to whether she was pregnant to the jury, even though two physicians expressed the opinion that at so early a period it could not be known with certainty without a microscopic examination or the discovery of the ovum whether she was enceinte." The court held that: "Proof of pregnancy is essential to conviction for an attempt to cause miscarriage, but need not be to an absolute certainty; it is sufficient if the proof is so reasonably certain as to silence all reasonable doubt. * * * "

In State v. Alcorn, 7 Idaho 599, 64 P. 1014, the facts disclosed that the deceased, 20 years old, was in good health up to June 21, 1899. She stated to the accused that she was pregnant and believed she had been so a little over two

months. The evidence was held to be sufficient to be presented to the jury in the following language: "In a prosecution upon the charge of murder, where the death of deceased is alleged to result from an operation performed for the purpose of bringing about an abortion, the pregnancy of deceased must be proven beyond reasonable doubt, but need not be demonstrated to an absolute certainty."

In the case of State v. Loomis, 90 N. J. L. 216, 100 A. 160, in speaking on the question as to whether there was evidence to justify the jury in finding pregnancy, that is, the existence of the condition beginning at the moment of conception and terminating with the delivery of the child, the court cited 1 C. J. 312, and held there was ample proof to go to the jury on this question, and full justification for its findings if it believed the evidence, as it was entitled to do. There was direct evidence of sexual intercourse with defendant Loomis on more than one occasion; of the subsequent cessation of menses; of nervous and functional disturbances which, in the opinion of medical experts for the state, denoted probable pregnancy. Absolute demonstration was, of course, impossible, as it was claimed that the foetus had been expelled.

In 2 Allen McLane Hamilton and others, A System of Legal Medicine, p. 441, it is said: "If pregnancy proceeds normally the first evidence or intimation of its presence to the woman consists in the absence of the menstrual flow when the time for its appearance has arrived. * * * If the ovum is not disturbed and the time for the menstrual flow recurs again with experience similar to that of the preceding month the hope or suspicion of pregnancy which was entertained by the woman will, in most cases, have developed into a certainty."

In the case of People v. Richardson, 161 Cal. 552, 120 P. 20, the woman testified that in March 1909, she missed her usual monthly sickness and told the defendant that she was in the family way. She missed her sickness the following month and again told the defendant, and he said he would get some pills, which he did, to start the flow, which did not

occur. He obtained more pills for her which she took in May 1909. She had morning sickness as early as April 1, 1909, a complaint, according to the doctors, that almost always indicates pregnancy. The following was quoted with approval from Powe v. State, 48 N. J. L. 34, 2 A. 662: "The plain and obvious meaning of the act was not to require such proof (proof of absolute knowledge of pregnancy), and the construction given it in this case conforms to the manifest intent of the legislature." The court said: "We are satisfied that it must be held that these facts were sufficient to warrant the jury in concluding that the woman was pregnant at the time defendant furnished her with the pills."

In the case of State v. Rudman, 126 Me. 177, 136 A. 817, the following questions were propounded: "Q. Assuming it to be a fact that a girl 17 years of age who had been regular in her menstrual periods menstruated along the first of January, the 3rd or 4th, and whose menstrual periods usually continued for four or five days, had sexual intercourse within four or five days after the cessation of that menstrual period and then later had sexual intercourse one or more times and she felt weak, did not have appetite for food, did not feel in her normal condition, and had not menstruated again by the 10th of February—would that in your mind indicate or not indicate pregnancy? A. It might and it might not. Q. Would it be a symptom of pregnancy? A. Yes sir."

The court in the case last cited said: "Absolute certainty of the pregnancy of the girl is not and could not be established. The circumstances, however, we think, are sufficient for the jury to find beyond a reasonable doubt that it existed. No explanation or reasonable cause for the suspension of the girl's February menses appears. If the jury believed her statement, and they evidently did, the discharge of clots and fleshy matter some few days after the alleged operation gives strength to the claim of pregnancy. Her statement to the doctor, if true, that she thought she was pregnant is of some weight. * * *

"We cannot say that the evidence offered by the State to establish the pregnancy of the woman, * * * , is so defective or weak that a verdict based upon it could not be allowed to stand."

In view of the foregoing authorities, and from an analysis of the facts in the instant case with reference to the pregnancy of the complaining witness, it is clear we have proof of her physical condition and reactions and functional disturbances which, as a matter of common knowledge, denote probable pregnancy. We hold, therefore, that such evidence was sufficient to justify the jury's conclusion that pregnancy, as a necessary element of the offense here charged, was established, and the trial court did not err in submitting the case to the jury.

The statute was passed in the interest of good morals, and for the preservation of society, and the law punishes abortions willfully produced at any time during the period of gestation. The crime is complete under the statute if the abortion is made at any time during pregnancy.

There are other assignments of error which we deem unnecessary to discuss as not being meritorious.

The verdict of the jury, the judgment and sentence of the court must be, and is, affirmed.

AFFIRMED.

PAINE, J., participating on briefs.