ROBERT SALL, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

61 N. W. 2d 256

Filed December 4, 1953. No. 33347.

*Keith Windrum* and *W. A. Stewart,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Richard H. Williams,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The plaintiff in error was charged with, tried for, and convicted of the crime of mayhem. His motion for new trial was denied and he was adjudged to be confined in the State Penitentiary. He has brought the record of the case here for review.

The sufficiency of the evidence to sustain the verdict of guilt is challenged by the plaintiff in error, hereinafter identified as defendant. The occurrence resulting in this prosecution took place in Gothenburg between the hours of 5 and 6:30 p. m. on September 25, 1952. It was a day of celebration and the last day of the fall festival in that city. A rodeo was the afternoon attraction. When it was finished many of the persons attending the festival visited the saloons or beer taverns of the city, one of which was "Bert and Earls." The length

of the pause at the bar by many of the customers was brief, a matter of minutes, but for some it was much longer and lasted hours. The tavern, frequently referred to in the record as Bert and Earl's, had its front on the north side of U. S. Highway No. 30, a bar on the west side, and customers' booths on the east side. There was a door on the front or south and a door on the north or rear. The room was about 60 feet in length. There was a space between the north end of the building and the alley used for loading, unloading, and other purposes in the conduct of the business. This place of business, hereinafter designated as the tavern, and the space to the rear of it was the location of the unfortunate acts resulting in this litigation.

Arthur S. Houchin, prosecuting witness and victim of the injury complained of, entered the tavern with his father, James Houchin, between 5 and 6 p. m. and occupied the rear booth with Henry Derra and three or four other persons. The defendant, his wife, and other persons were in a booth towards the front. About 6 p. m. the defendant accompanied his wife to the rear of the tavern where she visited the ladies' rest room. The defendant stopped at the rear booth and talked with Henry Derra. He permitted the lighted cigarette he had in his hand to come in contact with and to burn James Houchin on the right wrist twice. The second time Houchin said to the defendant " 'watch your cigarette,' " and the defendant said " 'do you want to make something out of it,' " grabbed Houchin by his clothing near his throat, and hauled him out of the booth. They wrestled but no blows were struck. There were vulgar name-calling and profane epithets voiced. Arthur Houchin interfered with the defendant and his shirt was considerably torn. The intercession of persons, including a bartender, prevented further combat at that time. The parties returned to and again occupied their respective booths and resumed beer drinking.

The elder Mr. Houchin and a Mr. Chapin, who had

just then entered the tavern, went out the front door. Mr. Houchin noticed that his son had not followed or joined them. He started back to get his son and met the defendant near the doorway. He cursed and attempted to attack Mr. Houchin but was prevented by the bartender and Mr. Chapin. Mr. Chapin and Mr. Houchin returned to and remained in the rear booth they had occupied. Arthur Houchin and Mr. Derra had remained there.

The defendant, his wife, and two rodeo performers went to the home of defendant and he there discarded his torn shirt and put on another. They returned to the tavern. The defendant entered alone by the rear door, went to the booth where Arthur Houchin, sometimes called Dude, was and said that he wanted "Dude to come out and settle it." He told defendant he had nothing to settle and did not want any trouble. A bartender escorted defendant from the booth. The defendant was asked at the trial the meaning of his request that Arthur Houchin "come out and settle it" and his answer was "There's my exhibit (indicating his torn shirt); you don't allow people to tear your shirt off and walk away from it."

The elder Mr. Houchin had been told by someone that there was going to be trouble before he and his son could get away. He bought two bottles of beer, put one in his pocket, gave one to his son, and made the statement that there might be some trouble there that evening. About 30 minutes after the defendant had challenged Arthur Houchin to "come out and settle it" Chapin and the Houchins left the tavern by the rear door. Gail McKim was in a booth towards the front with the defendant, his wife, Aaron Lee Olson, and two cowboys. McKim testified that he "understood there was to be a fight," and that the wife of the defendant got up and said " 'there they go.' " The defendant and Aaron Lee Olson left the booth and in a "good, fast walk" went to the rear of the tavern and out behind.

About the time Chapin and the Houchins were going through the back door the defendant called out " 'here I am.' " Mr. Chapin looked around and saw the defendant and Olson coming "plenty fast." The defendant proceeded toward Arthur Houchin and Olson grabbed James Houchin. He hit Olson on the head with a bottle of beer and Olson knocked him down. They had a bloody fight. Mr. Chapin grabbed the defendant and called to the Houchins to hurry away from there. The defendant was trying to contact Arthur Houchin. Mr. Chapin held defendant about 30 seconds until someone hit Chapin across the back of the head, knocked him down, and rendered him unconscious for a time. The defendant then attacked Arthur Houchin and they fought for a brief time. They were on the ground. Defendant was on top. Arthur Houchin felt defendant injure his left ear, and at about the same time he got the bottle of beer out of his hip pocket and struck the defendant across the back and somewhat to the side of his head. Arthur Houchin called for someone to take defendant off of him and that was done. When Arthur Houchin got to his feet he cried out that the defendant " '* * * tore my ear off.' " When the defendant approached Arthur Houchin he was not in usual fighting form but had his arms apart as if to take him in his arms. That is what he did and they went to the ground. After the fight defendant had blood upon his face and lips and was seen to spit when he got off of his victim. The left ear of Arthur Houchin was bit and torn off and he bled profusely. The defendant claimed he was rendered unconscious by the blow on his head and that he had not bit Arthur Houchin before he had passed out. After the fight, but before the defendant left the place of the encounter, his wife said to him " 'that Kid's lost an ear,' " and the defendant exclaimed " 'Oh, my God.' " He was asked at the trial if he bit off the left ear of Arthur Houchin and he gave this equivocal answer, "Not that I know of * * * not that I can remember." His wife

also said that when Arthur Houchin asked someone to get the defendant off of him that "Bob came right off," and that the fight lasted just a few seconds.

Police officers of the city went to the place pointed out to them as the location where the fight took place within about an hour of the time of the fight and found a human ear that had been recently removed from some person. It had marks on it that could have been made by the teeth of a human being.

The defendant and Lloyd Peterson had a fight on November 14, 1946. Defendant made no effort to hit Peterson but went down under his arms, grabbed him around the waist, and bit him on one of his ribs. Peterson put his arm around the neck of defendant. He bit the arm about four times and the marks he made on it were visible for about two months. Defendant and Gail McKim had a fight during the year 1947. McKim was grabbed by defendant and taken into his arms. They went to the ground, rolled, and wrestled, and when it was over McKim had been injured on the chest and one eye by the teeth of defendant. Defendant and Arthur Houchin had a fight in 1949 at the Oasis Cafe in Gothenburg. The defendant bit him on his chest and made a mark that was there for three or four months after the fight.

The defendant was accused by the State of willfully, unlawfully, and purposely biting and chewing off the left ear of Arthur Houchin with the intent to maim and disfigure him. There was evidence from which the jury could find that each part of the charge made by the State was true. There is conflict in the evidence but it was the province of the jury to determine the part it would accept and believe, and what part thereof it would reject. The credibility of witnesses and the weight of the evidence are for the jury to determine in a criminal case and its conclusion may not be disturbed by this court unless it is clearly wrong. Griffith v. State, *ante*

p. 448, 59 N. W. 2d 701. The evidence supports the verdict. It is not clearly wrong.

Defendant protests strenuously that proof of guilt is lacking because he claims there is no direct evidence that he intended to maim or disfigure Arthur Houchin. It is not required that there should be. Criminal intent may be shown by circumstances. Baskins v. State, 138 Neb. 334, 293 N. W. 270. The court advised the jury in substance, as the defendant desired, that the intent with which an act is done is not usually susceptible of proof by direct evidence but may be inferred from the words and acts of the party concerned and the facts and circumstances attendant upon the act charged to have been committed. The unjustified, quarrelsome, and belligerent attitude and conduct of the defendant before the fight in which the complaining witness lost his ear, his insistence that Arthur Houchin join him in a fight to settle some imagined wrong, his determination to avenge his honor because his shirt was torn publicly, the absence of any reason for the assault he made when the ear was bitten and torn off, the fact that the defendant had put his teeth in service as a weapon of offense in prior fights in which he had participated, and the many other incidences in the evidence were circumstances from which the jury might well have concluded that the defendant intended to severely chastise and humiliate Arthur Houchin in a severe manner with permanent results. The record justifies the conclusion of the jury that the defendant intended to maim and disfigure his adversary.

The defendant contends that he was prejudiced by the refusal of the court to include in his charge to the jury, as he requested, that malice was an element of the crime for which he was on trial; that malice is that condition of the mind which is shown by intentionally doing a wrongful act without just cause or excuse; and that it means any willful or corrupt intention of the mind. The part of the statute important to this case is: "Whoever shall willfully, unlawfully, and purposely * * * bite the

* * * ear * *· * or disable any * * * member of any person, with intent to * * * maim, or disfigure such person, shall be imprisoned in the penitentiary * * *." § 28-406, R. R. S. 1943. The court in the instructions given to the jury quoted the statute except the penalty clause, informed it that the substance of the information accused the defendant of willfully, unlawfully, purposely, and feloniously biting and chewing off the ear of Arthur Houchin with intent to maim and disfigure him, and that to convict the defendant the State was required to establish by the evidence beyond a reasonable doubt that he purposely, feloniously, and unlawfully bit and chewed off the ear of his victim with the intent to maim and disfigure him.

Malice in a legal sense denotes that condition of mind which is manifested by the intentional doing of a wrongful act without just cause or excuse. It is sometimes defined as any willful or corrupt intention of the mind. It is said in Alt v. State, 88 Neb. 259, 129 N. W. 432, 35 L. R. A. N. S. 1212: "In criminal law, 'malice' may denote that condition of the mind which is manifested by the intentional doing of a wrongful act without just cause or excuse." See, also, Cate v. State, 80 Neb. 611, 114 N. W. 942; McVey v. State, 57 Neb. 471, 77 N. W. 1111; Housh v. State, 43 Neb. 163, 61 N. W. 571; Annotation, 38 L. R. A. N. S. 1100.

The instructions in this case, considered as a whole, in defining the crime charged against the defendant and the nature and quality of the evidence required of the State to convict him of the offense charged, used the words unlawfully, willfully, purposely, and feloniously. These included the full signification of the terms malice or maliciously. In Whitman v. State, 17 Neb. 224, 22 N. W. 459, this court said: "In an indictment under section 16 of the code for shooting with intent to kill the word 'maliciously' was omitted, but it was alleged that the act was 'unlawfully, willfully, purposely, and feloniously' done. Held, That these words included the

full signification of the word 'maliciously' * * *." An instruction is not required to contain the exact language of the statute, if words equivalent in meaning are used in defining the offense or the elements of the case that the State must establish to justify conviction of the accused. See, Cooper v. State, 123 Neb. 605, 243 N. W. 837; MacDonald v. State, 124 Neb. 332, 246 N. W. 716; Hans v. State, 147 Neb. 67, 22 N. W. 2d 385; Spreitzer v. State, 155 Neb. 70, 50 N. W. 2d 516. The words employed in the charge to the jury were the equivalent in meaning of the words of the statute defining the offense involved herein and comprehended the full legal meaning of the word malice. The instruction defining malice tendered by the defendant would not have added anything to the instructions given but would have been only a repetition in different words of a part of them. Smith v. State, 153 Neb. 308, 44 N. W. 2d 497.

The word willfully or purposely means intentionally and not accidentally or involuntarily, and the word feloniously means proceeding from an evil purpose or done with deliberate intention of committing a crime. Felonious describes a willful act and feloniously in a legal sense refers to an act done with intention to commit a crime. Wood v. Commonwealth, 246 Ky. 829, 56 S. W. 2d 556; Gatewood v. Commonwealth, 215 Ky. 360, 285 S. W. 193; State v. Dickerson, 139 La. 147, 71 So. 347; 36 C. J. S., Felonious, Feloniously, p. 633; Black's Law Dictionary (3d ed.), p. 763. This assignment of error cannot be sustained.

The defendant contests the correctness of the action of the trial court in permitting the State to present the evidence detailed above concerning three previous fights in which defendant participated and in each of which his teeth were used to inflict injury upon the person with whom he was contesting. This testimony was admitted for whatever bearing it had upon the intent of the defendant in inflicting the injury upon Arthur Houchin. The trial court carefully advised the jury to

this effect. The basis of the objection of defendant is that the prior offenses were each too remote and that the evidence of any of them had no probative value as tending to prove the fact in issue, the intent of the defendant at the time of the offense charged against him in this case. In Stagemeyer v. State, 133 Neb. 9, 273 N. W. 824, the court said: " 'It is a general rule that, on the trial of one accused of crime, proof of distinct and independent offenses, even of a similar nature, is inadmissible. To this rule there are exceptions; but, in order to make evidence of other independent offenses admissible, it must appear that the evidence offered falls within one of the recognized exceptions.' " Evidence of a separate and distinct crime committed by the accused is admissible in a prosecution of a crime that has an element of motive, criminal intent, or guilty knowledge. Henry v. State, 136 Neb. 454, 286 N. W. 338; Turpit v. State, 154 Neb. 385, 48 N. W. 2d 83. An exception to the general rule important in considering the objection made in this case is stated in Foreman v. State, 126 Neb. 619, 253 N. W. 898: "Evidence of other crimes, similar to that charged, is relevant and admissible when it tends to prove a particular criminal intent which is necessary to constitute the crime charged. Whether such other alleged crimes are too remote rests largely in the discretion of the trial court." See, also, Turpit v. State, *supra*. Defendant has referred to many Nebraska decisions on this subject but an examination of them has failed to disclose that a reversal in any one of them was had because of the remoteness of the prior similar offenses. Independent research has not led to a case in this jurisdiction where a reversal was made on the ground of remoteness. The extent to which the discretion of the trial court will be allowed to be exercised in this regard has not been fixed by any decision of this court. Probably it cannot be but depends upon the facts in each case. Courts of other jurisdictions have spoken on the subject. In State v. Siddoway, 61

Utah 189, 211 P. 968, it was held: "No exact limitation of time can be fixed as to when another offense tending to prove the intent of the act charged is remote. The decision of that question must depend upon the circumstances of the particular case, and whether evidence is too remote or not is a question whose decision is largely in the sound discretion of the trial court." See, also, Exchange Bank v. Moss, 149 F. 340; State v. France, 146 Kan. 651, 72 P. 2d 1001; State v. Konzen, 186 Iowa 1057, 171 N. W. 137. The doctrine generally accepted is that remoteness in point of time may weaken the evidential value of the evidence but does not justify its exclusion. State v. France, *supra;* State v. Ridgway, 108 Kan. 734, 197 P. 199.

Likewise it is a matter left to the discretion of the trial court as to whether the prior offenses are sufficiently similar to the one charged in the case on trial so that evidence thereof has probative value. In Exchange Bank v. Moss, *supra,* the court said: "It is sometimes said that the collateral instances, evidence of which is admissible, are those that occurred at or about the time of the one in question, yet in practice the proximity in point of time is largely left to the discretion of the trial court. The same is true of the degree of similarity." The evidence to which this assignment is directed was properly admitted.

The argument of defendant that the trial court should have instructed the jury on the defense of insanity is without merit. The claim of defendant is that he was unconscious from the time he was struck on the head with a beer bottle until after the fight was ended. If he was it is necessarily true that the injury to Arthur Houchin was inflicted before the blow was struck because the cause of his claimed temporary insanity was the blow on his head. The evidence is that the time he was struck on the head with the bottle of beer and the time of the injury to the ear were substantially contemporaneous. It may also be said that the intention of the

defendant was arrived at and was being pursued before he was hit on the head with the bottle. The court would not have been justified in submitting to the jury for its consideration the defense of the insanity of the defendant.

The sentence is said by the defendant to be excessive. The punishment for the offense charged is imprisonment in the State Penitentiary for not less than 1 year or more than 20 years. § 28-406, R. R. S. 1943. The record does not show that the discretion vested in the district court was abused by imposing upon the defendant a sentence of 3 years. This court has authority to reduce a sentence imposed for the commission of a crime but it will not often do so if it is one of violence and involves moral turpitude. Sundahl v. State, 154 Neb. 550, 48 N. W. 2d 689. If the punishment of an offense is left to the discretion of the trial court to be exercised within prescribed limits, a sentence imposed will not be disturbed unless there is an abuse of such discretion. Carr v. State, 152 Neb. 248, 40 N. W. 2d 677.

The sentence and judgment of the district court should be and they are affirmed.

AFFIRMED.